# R. BISHOP'S HEIRS v. THE ADM'R AND HEIRS OF S. BISHOP.

1. Parol evidence is admissible to show, that a deed, or bill of sale, absolute on its face, was intended as a mortgage, or that it was executed and delivered upon certain trusts, not reduced to writing, and upon the proof being made, a court of equity will decree their execution.
2. A court will not declare a deed absolute on its face, to be conditional, or upon a trust, but upon strong and stringent proof, and will pay but little attention to the casual remarks of men about their property; but when the trust is clearly made out, will execute it.
3. It is only necessary in chancery pleading, to alledge the facts upon which the relief is sought; and though the proof of the fact consists of the admissions of the opposite party, it is not necessary to alledge in the bill, that such admissions were made.
4. The complainants having alledged two trusts, first, that the trustee was to hold certain slaves for the use of the complainants, for a fixed period, and then to convey them; the last mention trust being proved, should be enforced, though the complainants failed to prove a trust in their favor before that time.

Writ of Error to the Chancery Court of Autauga. Before the Hon. W. W. Mason, Chancellor.

THE bill alledges, that Reuben Bishop, the father of complainants, Phebe Ann, Patience, Alfred, James, Abraham and Mary, on the 25th day of September, 1825, in the county of Greene, and State of Georgia, conveyed to James W. Fannin certain slaves, with their increase, upon the express agreement and understanding, made by said Reuben Bishop and said Fannin, that he, the said Fannin, would convey said slaves to the State of Alabama, and deposit them with Stephen Bishop, the brother of Reuben Bishop, to be held by the said Stephen Bishop, in trust for the benefit of the children of the said Reuben, until the youngest should arrive at the age of twenty-one, and then to convey said slaves with their increase, to said children. That Fannin received the said slaves upon the foregoing terms and conditions, and in 1827 brought the slaves to Alabama, and delivered them to Stephen Bishop, who received them upon the terms and trust aforesaid. That although said Fannin received said slaves under a bill of sale, absolute on its face, and expressing a consideration of $6,700, yet it was intended and meant by the said Reuben Bishop, and understood and received by the said Fannin, as a conveyance, for the purpose of enabling him to remove said slaves from the State of Georgia, to the State of Alabama, and to deposit them with the said Stephen Bishop, for the purpose aforesaid; and that no part of the consideration expressed in said bill of sale was ever paid, or intended to be paid to the said Reuben Bishop, and nothing was paid by the said Stephen Bishop, on receiving them of Fannin. That the said Stephen Bishop received them of said Fannin on the trust heretofore expressed. That said Stephen has sold two of them, Peter and Dinah, but complainants do not know how much he received for them. That Stephen Bishop retained the possession of said slaves until his death, in 1840, and that John Wood one of the defendants was appointed administrator of his estate, and as such, took possession of said slaves. The bill then goes on to state, that said slaves have been distributed amongst the defendants, who are the heirs at law of Stephen Bishop,

some being retained by Wood, in the right of his wife, who was the daughter of Stephen Bishop. The bill then designates such as have come to the possession of each of the defendants, and their respective value, and avers that the labor and services of said slaves were received by said Stephen during his life, and that the value of such services, after deducting all reasonable expenses, amounted to $14,500. That Reuben Bishop departed this life in the year 1827. That Phœbe Ann, Patience, Alfred, James, Abraham and Mary, are the only children living of the said Reuben Bishop, and are his heirs at law. That Phœbe Ann has intermarried with Reuben Turner; Patience with Waddy Jackson, and Mary with William Jackson, who are made parties complainants. That each of the complainants have arrived at the age of twenty one years, and are entitled to a conveyance of said slaves, and to receive the value of their hire and services. That said Wood, as administrator, and said defendants, the children of Stephen Bishop, have failed, and neglected to convey said slaves to complainants, or to account for their services.

The bill prays that the trust be established, that the defendants be decreed to hold said slaves in trust for complainants, that they do convey the same, and that they account for the profits and value of said slaves, and also for general relief.

The defendants file a joint answer to the bill. They admit that Reuben Bishop may have executed a bill of sale of the slaves to Fannin, but deny that there was any agreement that Fannin was to convey said slaves to Alabama, and deposite them with Stephen Bishop, to be held by him in trust for the children of Reuben, until the youngest became of age, and then to convey them to the children of said Reuben. The answer further denies, that Fannin received the negroes on said terms and conditions; and from information and belief, the defendants state, that Reuben Bishop and his wife, not living happily together, he had executed a deed of trust to one Mapp, conveying to him, for the use of his wife, during her life, certain negroes, stock, land, &c. That Reuben Bishop was considerably indebted at the time; that the creditors became clamorous, and distrustful of the security of

their debts; that in this extremity he applied to Stephen Bishop, and proposed to sell him the negroes. That Stephen Bishop executed a power of attorney to said Fannin, who was a nephew, and resided in the same county of Georgia with said Reuben, authorizing him to purchase said negroes; that said Fannin did purchase said negroes by virtue of the authority contained in said letter of attorney, from the said Reuben Bishop. That said purchase was absolutely made by said Fannin, as the agent and attorney of said Stephen, without any trust or condition, except that it was made for the benefit of said Stephen Bishop. That from the best understanding and information respondents have, Stephen Bishop paid some money, and secured and paid some debts of Reuben, and conveyed some lands in Alabama to said Reuben, that belonged to him, Stephen Bishop.

The answer admits that the slaves were brought to Alabama by Fannin, but denies they were brought on the terms, conditions and trusts charged in the bill, or that they were delivered to Stephen Bishop on these terms, or that Fannin received them from Reuben Bishop on any trust different from the terms expressed in the bill of sale; except that the conveyance was to Fannin, and was intended for the use and benefit of Stephen Bishop, and was executed to him, Fannin, to enable him to remove said slaves the more readily to Alabama, and to deliver them to Stephen Bishop, for his own use and benefit, which slaves Fannin had purchased with the funds of the said Stephen Bishop.

The answer denies that the consideration was not paid to Reuben Bishop, and on the contrary insists, that a full and fair consideration passed from said Fannin, as the agent of Stephen Bishop, to Reuben, for said slaves, in cash, assumptions of debt, and lands in Alabama. The answer admits that no consideration passed from Stephen Bishop to Fannin, at the time of the delivery of said slaves to Stephen Bishop by Fannin, as he was the agent of Stephen Bishop in the purchase, but denies that Stephen Bishop received said slaves upon the terms, conditions, and trusts set forth in the bill; but that said slaves were received by said Stephen from Fannin, as his own property, and for which he had and was to pay the consideration expressed in the bill of sale. The

answer admits that Stephen Bishop departed this life in 1840, and retained possession of the slaves, except the two alledged to be sold, and the boy Tom, which was given to defendant, Wood, in 1837; and that John Wood is the administrator of Stephen Bishop. That the negroes named in the bill have been divided between the children of Stephen Bishop, except Peter and Dinah, who were sold by Stephen Bishop in his lifetime, and Tom, given to Wood, but deny the existence of one alledged in the bill, by the name of Jane.

The answer admits the death of Reuben Bishop in 1826, or 1827, and that the defendants did not buy said slaves, but received them as the distributees and heirs at law of Stephen Bishop. That the complainants are the children, and heirs at law of Reuben Bishop, and may have intermarried as alledged in the bill, but do not admit that Mary Ann is twenty-one years old.

The answer further states, that said Fannin executed to said Stephen Bishop a bill of sale of said slaves, and upon the removal of Reuben Bishop to Alabama, that Stephen and Reuben had a full and fair settlement, at the house of Reuben Bishop, and in said settlement was estimated the value of said slaves, as also the land bought by said Reuben of Stephen Bishop, and then resold to said Stephen, and of all monies paid for said Reuben by said Stephen; and that on said settlement, said Reuben executed to said Stephen Bishop a bill of sale for said slaves, including an infant that had been born, bearing date about the 1st of March, 1826.

The defendants also state in their answer, that Alfred and James, two of the complainants were received into the family of Stephen Bishop, and supported and educated for ten years by Stephen Bishop; and that if the trust is established in their favor, that they should be held to account for their board, support, &c. But denies the right of complainants to call on the defendants for the slaves, or their value.

The chancellor considered that the trust was not so clearly ascertained as to authorize the interference of chancery, and dismissed the bill.

This is now assigned for error in this court.

BELSER and HARRIS, for plaintiffs in error.

1. Where the testimony supports the allegations of a bill substantially, this is all that is required; and relief will not be denied because there is a discrepancy between the case as alledged and that proved, in some unimportant particular. Eldridge, et al. v. Turner, 11 Ala. 1050; Gilchrist v. Gilmer, 9 Ala. 985; Graham v. Lockhart, 8 Ib. 10; Strange v. Watson, 11 Ala. 325.

2. There was a delivery of the property, and a trust created for the benefit of the complainants. The evidence shows, that the donor parted with the dominion of the slaves for the use of the donees, and that the trustee recognized it to the fullest extent. See Durrett v. Sewall, 2 Ala. 669; Walton v. Tims, et al. 7 Ib. 473; Eldridge v. Turner, 11 Ib. 1055. To coerce the execution of a trust, the most stringent proof is not required. Sledge's Adm'rs v. Clopton, 6 Ala. 603; Kennedy's Heirs v. Kennedy's Heirs, 2 Ib. 622. And property received by one from another in trust, the former will be compelled to perform his engagement, and if he dies, his representatives cannot defeat it. Dearman v. Radcliffe, 5 Ala. 192.

3. The declarations, or admissions of a party, made after a sale or conveyance of property, are not admissible to defeat the conveyance, or a title derived through him, by the conveyance. Bradford v. Bush, 10 Ala. 386; Powell v. Olds, 9 Ala. 864; Julyann v. Reynolds, 8 Ala. 680; Lee v. Hamilton, Adm'r, 3 Ala. 529; High v. Stamback, 1 Stew. 24. The complainants, as the case is, claim by purchase, the defendants by descent; hence the declarations and acts of Reuben Bishop, after the delivery of the property, for the use of the complainants, and the acceptance of the trust by Stephen Bishop, cannot be received against them; but the declarations of Stephen Bishop, are evidence for the complainants, and are good against the defendants. 4 Black. Com. 2 vol. mar. page 201; 1 Greenl. Ev. § 189; Norton v. Pettibone, 7 Conn. 323; Newman v. Kohr, 4 L. & Rawle, 174; Ivatt v. Finch, 1 Taunt 141; Lee v. Hamilton, Adm'r, 3 Ala. 533.

4. The material part of Aldridge's testimony should have been excluded. The controversy, as appears from it, had

been commenced previously between the parties, and this rendered it inadmissible. 1 Greenl. Ev. § 131; Bradford v. Hagerty, 11 Ala. 698.

5. On the entire testimony in the cause, the trust is established. The evidence is consistent with it, and inconsistent with the idea of a sale of the property. The execution of the bills of sale, and the money paid, are all reconcilable with the trust, as will appear most fully from the record.

HOPKINS, STORRS, and YOUNG, contra.

The bill alledges the plaintiffs were, as beneficiaries, entitled to the slaves, when the youngest child of their father attained lawful age. There is no allegation in the bill, that the youngest child ever attained lawful age. There is an allegation that all the complainants are of lawful age, but none that either of them was the youngest child of their father. The right therefore to demand the execution of the alledged trust is not shown by the bill. Story's Eq. Pl. § 257, 258, 263, 264; 10 Wheat. 189; 10 Peters, 178; 1 Ala. Rep. 333; 3 Ib. 421; 4 Porter, 297; 5 Ib. 345; Story's Eq. Pl. § 28.

The counsel of the parties made written admissions, among which is one, on the part of the defendants, that the youngest child was of age before the bill was filed. This evidence can have no effect upon the cause. The complainants make in their statement of their own case, their right to the possession of the property, to depend upon the time when the youngest child should become of lawful age, and omit to show that the youngest child ever attained that age. Story's Eq. Pl. § 28, 251, 258, 263, 264; 4 Porter's Rep. 297; 5 Ib. 345; 1 Ala. Rep. 333; 3 Ib. 421; 10 Peters, 178, 189; 3 Porter, 473.

The bill alledges, the trust the complainants claim the benefit of, was founded upon the absolute written conveyance made by Reuben Bishop to Fannin, which they charge in their bill bears date in September, 1825. There is no evidence of any conveyance made in September, 1825, by Reuben Bishop to Fannin. The evidence which relates to the alledged trust is irrelevant without proof of the absolute con-

61

veyance, which the bill alledges was clothed with the trust described in it. All the evidence of the trust therefore is incomplete. Story's Eq. Pl. § 257, 258, 263, 264; 1 Ala. 333; 3 Ib. 421.

As the complainants have offered no evidence that the conveyance of September, 1825, under which they claim, was made, they have no other claim than as heirs at law of their father. They make no case in the bill for relief, as heirs, and if they had such a case, it would be disproved by the declarations of their father, under whom they would, in such a case, claim.

They have no evidence of the trust they alledge in the bill. As they have not proved the case made in the bill, upon which they rely to show a title independent of one by descent, and exempt from the effect of declarations made by their father, after he created the alledged trust for them, all his declarations, as proved, are competent evidence, because the testimony does not prove his right to affect his claim to what belonged to him, was inferred by the creation of the trust set up by the bill.

The evidence of the declarations of Stephen Bishop, that he held the property as trustee, is incompetent, because it is not alledged in the bill that he ever made such declarations. Such declarations from him are not put in issue by the bill. Story's Eq. Ev. § 263; Gresley's Eq. Ev. 288.

A court of chancery will not compel the execution of an agreement against the person who made it, unless the terms, as proved, are clear, definite and positive. 2 Story's Com. on Eq. § 764, 767, 769, 770; 3 Summer's Rep. 435; Kendall v. Almy, 2 Summer's C. C. Rep. 295. There is still more difficulty in enforcing it against an assignee, or heir of the party. 2 Summer's Rep. 295. The terms of the alledged trust, as shown by the evidence, are not of the character which have been mentioned, and are not referable to the absolute conveyance upon which the complainant's found the trust, the benefit of which they claim. 2 Story's Eq. § 764. The evidence is contradictory, as to the number of beneficiaries in the alledged trust.

Evidence of verbal admissions ought to be received with great caution. Greenl. Ev. § 200, and § 96, p. 108; 24

Com. L. Rep. 448; 10 Vesey, 518. The weight of evidence is against the existence of any trust.

DARGAN, J.—It is too well settled by the decisions of this court, now to admit of doubt, that though a deed, or bill of sale be absolute on its face, parol proof may be received to show, that it was intended as a mortgage, or that it was executed and delivered upon certain trusts, not reduced to writing, but existing in parol, and which the grantee, or donee promised to perform; and these trusts may be shown by parol proof, and a court of equity will decree their execution.

In the case of Kennedy's Heirs v. Kennedy's Heirs, 2 Ala. Rep. 589, this court said, that parol proof may be received to show, that a party who received a deed absolute on its face, promised to dispose of the property in a particular manner, and if he refused to perform his promise, it was competent for a court of equity to decree its execution; and in the Administrators of Sledge v. Clopton, 6 Ala. —, this court held, that parol proof could be received in a court of equity, to show, that a bill of sale of slaves absolute on its face, was intended first as a security for a debt due by the maker of the bill of sale, to him to whom it was made, and when the debt was paid, then the party was to convey the slaves to trustees for the use of the wife of the vendor; and the proof being sufficient to establish these trusts, the court decreed their execution.

The ground upon which courts of equity undertake to establish trusts of this character, is that of preventing the fraudulent use of a deed; for although there is no fraud in the execution of the deed, if it be afterwards converted to a fraudulent purpose, or to one wholly different from the one intended by both parties at the time of its execution, equity ought to interpose, and prevent such an improper use of it, and establish the trusts for which it was executed. See 6 Paige's R. 147; 1 Dallas Rep. 424. It has long been the established doctrine of the courts of equity, that if a party prevent the execution of a will, in favor of *another*, by a promise to the testator, that if he will not make the devise, he will convey, or pay an annuity, to the party to whom the testator intended to devise the estate, or in whose favor he intended to charge

it, a court of equity would decree the execution of the promise against the party making it.   See 3 Atk. Rep. 539; 2 Veasey & Beam's Rep. 259; 7 Sims Rep. 644; 14 Vesey's Rep. 290.   In those cases, a promise made by the party who took the estate after the death of the testator, prevented the execution of a devise, in favor of the party intended to be benefited by the testator.   This promise was not reduced to writing, and on the death of the testator, the estate vested absolutely, and unconditionally at law, in the promisor.   But a court of equity, whose duty it is to prevent frauds, as against the party making the promise, or his heir, will hold the estate bound by the promise, and decree its execution. Now if a promise which prevents the execution of a deed, or devise, in favor of another, will be decreed a charge, or a trust upon the estate, should not a promise, or an agreement that induces the execution of a deed, or a devise, be also established in equity as a trust upon the estate ?   If a promise prevents the execution of a deed, we must decree the execution of the promise.   If a promise in favor of another induces the execution of a deed, or forms its consideration, we must also decree its execution.

The question then is, on what terms, and conditions, did Stephen Bishop receive the slaves sought to be recovered. And here we will first examine the consideration of the bills of sale, executed to him.   It is alledged, that in September, 1825, Reuben Bishop conveyed the slaves to James W. Fannin, to be conveyed by him to Alabama, and deposited with Stephen Bishop, for the use of complainants.   The answer admits that Reuben Bishop did execute a bill of sale to Fannin, who was the agent of Stephen Bishop in the fall of 1825, but insists that it was an absolute purchase, and on a full consideration; but no witness says that he saw any money paid by Fannin to Reuben Bishop, and when Fannin executed a bill of sale for the negroes to Stephen Bishop, and delivered possession of them, no money passed.   This was on the 20th January, 1826.   On the first of March, 1826, Stephen Bishop being in possession of the negroes, received a bill of sale from Reuben Bishop, and then it is shown that he paid him $500 in money, and Stephen Bishop gave him up his notes to the amount of $1,200.   This is the only ev-

idence of actual payment, except that Reuben Bishop admitted full payment. But he died in 1826; and after Stephen Bishop was in possession of the slaves, he informed the witness Cook, that he had sent to get the negroes, and for this purpose a pretended debt was asserted against Reuben Bishop; that the object was, to prevent the wife of Reuben Bishop, or her father, from getting the control of the property, and that the whole arrangement, was to save the property for the children of Reuben Bishop, when they became of age. This witness had charge of the negroes, and delivered them to Fannin, under the instructions of Reuben Bishop. James B. Anderson, who is the nephew of Stephen and Reuben Bishop, says, that Stephen Bishop told him, that he received the negroes through Fannin, from Reuben Bishop, to hold for the benefit of Reuben Bishop's children. That Reuben Bishop drank hard, and managed his affairs badly, and that he sent Fannin to make a pretended purchase, for the purpose of bringing the negroes to Alabama, and save them for Reuben Bishop and his children; and that when Reuben Bishop's children became of age, they were to receive their negroes, and their increase. This was at the house of witness, in Wilcox county. The witness heard Stephen Bishop speak of the matter twice before the death of Reuben Bishop, and once after his death. After the death of Reuben Bishop, he heard Stephen say, that the property belonged to the children of Reuben Bishop, and that he had sold one negro, and taken another, to pay the expenses of law suits. Mrs. Glover, who is a niece of Stephen and Reuben Bishop, states that Stephen Bishop told her, that Fannin brought the negroes from Georgia, and that he held them in trust for his brother Reuben, and his children. Heard him speak of it repeatedly at his own house, and on the road from Mr. Tyus's to his house in 1833, which was after the death of Reuben Bishop.

Jesse Anderson states, that Stephen Bishop told him, that Fannin, as his agent, brought the negroes to Alabama; that he had a bill of sale for them, but had paid nothing except the expenses of law suits; that he was to hold the negroes for Reuben Bishop and his children; that he was to keep them separate from his own, until he got back all expenses,

and until Reuben's children became of age, and then they were to have them. The first time this witness heard Stephen Bishop speak of this was in 1825, or 1826, at another time in 1829, and again in Mobile in 1838.

Mary Anderson heard Stephen Bishop say, at her house in Wilcox, that Reuben Bishop's wife and her father were trying to get the property, and as Reuben could not manage his affairs well, he had taken it to save it for Reuben Bishop's children. In another conversation, he stated he had sent Fannin to Georgia for the negroes; that he had brought them to him, and that he had taken possession of the property, to hold it for Reuben Bishop's children, and when they became of age they were to have it.

These admissions were made, both before and after the death of Reuben Bishop, who died in 1826. To oppose this testimony, we have the declarations of Reuben Bishop, that he received full payment, and proof of $500 actually paid, and the giving up of notes to the amount of $1,200. But we find Reuben Bishop, from the testimony of the defendants in error, before his death in 1826, without money; and the answer states, that the land that Stephen Bishop sold to him, was re-conveyed back to Stephen, and the value of the negroes may be fairly stated at $6,000. The answer also sets up the assumption, and payment of debts by Stephen, but there is no proof of the payment of any one debt. The two brothers lived on terms of friendship, and after the death of the one, Stephen Bishop makes the same acknowledgments, of the terms and conditions upon which he held the property. What is the legal effect of those admissions, after the whole transaction was completed, and Stephen Bishop in the undisturbed possession of the property? They show the character of the title, and possession of Stephen Bishop, and are binding on him and his representatives. See 1 Greenl. Ev. 228. It is impossible to doubt, that he made those admissions from the number, as well as the character of the witnesses who depose to them, and the relation that some of them bear to the parties. Why did he make them? Because they were true, and he intended to execute the trust. It would be unreasonable to suppose, that if he had purchased the slaves absolutely for his own use, he would have made

those admissions to his own relatives. But he died before the trust was to be executed, and the defendants, not advised of the character of his title, resist the execution of the trust. But they are not purchasers for a valuable consideration, and the property in their hands is bound by it. It is true, that a court of equity requires strong, and stringent proof, before a decree will be pronounced declaring a deed absolute on its face, but conditional, or upon trust; and but little attention should be paid to the mere casual remarks of men about their property. Yet the often repeated declarations of Stephen Bishop, in regard to the character of his purchase of these slaves, and the persons to whom made, remove all doubt from the mind of the court, and hence it is our duty to declare the trust, so often declared by him in his lifetime.

But it is said, that as the trust is proved only by the admissions, and declarations of Stephen Bishop, and if the bill does not alledge those admissions and declarations, they cannot be received as proof. The rules of pleading, either in law or equity, are, that the facts on which the rights of the parties depend shall be alledged, and it is unnecessary to alledge the evidence that establishes these facts. Here the fact alledged is, that the bill of sale, though absolute, was intended by the parties as a trust, in favor of the complainants, and the declarations, and admissions, are but the evidence of this fact; and we think this is the correct rule of pleading. It is true, that in the exchequer in England, if the fact or gist of the bill is proved, and this can be established only by the admissions of the party, the court holds that those admissions should be averred in the bill. See 6 Price's Exchequer Rep. 240. And the same rule seems to be adopted by the Irish chancery court. But this rule certainly never has obtained in this State, nor have we been able to find a decision in any of the State courts, that recognizes the rule, that before the admissions of a fact can be received as evidence to prove it, these admissions must be averred in the bill.

The question did arise in the case of Smith v. Burnham, 2 Sumner's Rep. 612; and Judge Story, after reviewing the decisions in the exchequer, decided, that it was not necessary to alledge the admissions, or declarations, of a party which

were intended to be used as evidence to establish a fact, which was alledged. This has heretofore been the invariable practice of the courts of chancery of this State, and we see no reason why it should be now changed. We therefore come to the conclusion, that we can receive the admissions of Stephen Bishop, as evidence, although those admissions are not alledged.

The next question is, do those admissions prove the title, alledged by the complainants in their bill?

The bill alledges, that Reuben Bishop, on the 25th of September, 1825, executed to Fannin a bill of sale of the slaves, for the purpose of conveying them to this State, to be deposited with Stephen Bishop, to be by him held in trust, for the benefit of the complainants, the children of Reuben, until the youngest of the children became of age, and then to convey the slaves, with their increase, to the complainants, the children of said Reuben.

The answers admit the execution of the bill of sale to Fannin, but deny the trust; and the only evidence of the trust are the admissions of Stephen Bishop, before alluded to. Those admissions do not prove, that Stephen Bishop was to hold the slaves for the exclusive use of the complainants, until the youngest child of Reuben Bishop became of age; but if Stephen Bishop held said slaves, on any trust, (which may be doubted,) until the youngest child of Reuben Bishop became of age, the trust was for Reuben Bishop and his children; hence the complainants cannot recover the hire, or the profits of the slaves, before the youngest child became of age, for they certainly do not, up to that period of time, prove an exclusive trust in their favor, and by the bill, 'an exclusive trust is alledged. But all the witnesses agree, that when the youngest child of Reuben Bishop became of age, then the slaves and their increase were to be conveyed to the children of Reuben Bishop. An exclusive trust in favor of the complainants, is fully established by the proof after the youngest child became of age, and we are of the opinion, that this trust, under the allegations of this bill, ought to be enforced. It is true, that in order to entitle a complainant to relief, his allegations and proof must correspond, but in this case, two trusts are' alledged. The first is, that Stephen

Bishop should hold the slaves for the use of the complainants until a fixed period, and then he was to convey them to the complainants. The latter trust alone is proved, but it is proved as alledged, and we see no reason why this should not be enforced, because the complainants fail to prove a trust in their favor before that time.

Another objection is, that it is not alledged, that the complainants are the only children of Reuben Bishop, nor is it alledged that the youngest child has arrived at the age of twenty-one. This is a mistake: the bill shows that the complainants are the only children, and also alledges that Mary Ann, the youngest, is of age, and these allegations are shown to be true, by the admissions made of record upon the trial in the court below.

After the best examination we have been able to give this case, and with an anxious wish to arrive at the justice of it, we are compelled from the proof, to decree that the complainants, from the time the youngest became of age, are entitled to the slaves, except the two sold by Stephen Bishop to defray the expenses growing out of the removal of them from Georgia; the same proof that establishes the title of the complainants, to wit, the admissions of Stephen Bishop, shows that he sold two of the slaves to defray those expenses. The complainants are not entitled to recover for them. But the complainants are entitled to recover of the defendants, the other slaves with their increase, and are also entitled to recover the value of the use, or hire of the slaves, from the time the youngest child became of age. To ascertain this, a reference to the register is necessary. The decree of the chancellor is therefore reversed, and the decree that should have been rendered by the chancellor, must be here rendered.

It is therefore ordered, adjudged and decreed, that the defendants deliver up to the plaintiffs the slaves sought to be recovered by the bill, and which were in their possession at the time the bill was filed, together with their increase, if

62

any have since been born; and the cause is remanded, that it may be referred to the register, to take an account of the yearly value, and profits of the slaves, from the time the youngest child of Reuben Bishop became of age; and if it should appear that any of the slaves have died since the filing of this bill, it will be referred to the register to take an account, and state the value of such slave at the time the bill was filed.