### GORE ·v. CLARKE. ·

1. STATUTORY CONSTRUCTION—GIFT TO BASTARDS.—The statute, which forbids a man with wife or children from giving more than one-fourth of his' net estate to his mistress or bastard children, is remedial, and should be so construed as to suppress the evil, so far as is consistent with the terms of the statute.
2. CASE CRITICISED.— *Taylor* v. *McRa,* 3 Rich. Eq., 90, stated, explained, and distinguished.
3. GIFT TO BASTARDS—LEGATEE—SECRET TRUST—SCIENTER.—Where a testator bequeathed to a stranger more than one-fourth of his clear estate, with ·intent that this bounty should inure to the benefit of testator's mistress and bastard children, and left him surviving a wife and lawful children, the gift is void, as against the wife and lawful children, under the bastardy act, and on their complaint, notwithstanding this legatee, a mere voluntary donee, was not informed, before testator's death, of any secret trust attached to the gift. And the legacy, so illegally intended, was decreed to be paid over to the wife and her children.
4. CASE CRITICISED.—*Belcher* v. *McKelvey,* 11 Rich. Eq., 9, stated, and its reasoning applied to this case.

MR. CHIEF JUSTICE MCIVER *dissenting.* ₒ

This was an action by Kate B. Gore, a daughter of Benjamin F. Briggs, deceased, against James L. Clarke, and against Joseph F. Wallace, as executor of the will of the deceased, commenced June 6, 1890. The opinion states the case. The Circuit decree, omitting statements repeated in the opinion, was as follows:

The testimony of Major Hart, the counsel who drew the will, as to what was said by the intestate in reference to his intentions in making the will as he did, is competent, because the communications were made to him for the express purpose of being revealed on a contingency which has happened. None of the declarations of Briggs, however, as to the intentions with which he gave his estate to the defendant Clarke, are competent to affect Clarke, unless the same were brought home to Clarke before the death of Briggs. In *Strickland* v. *Aldridge,* 9 Vesey, 518, Lord Eldon quotes as authority *Adlington* v. *Cairn,* in which he says: "Lord Hardwicke was clearly of the opinion, that there being nothing in the· will attaching a trust, if

65—37

the testator afterwards by an unattested paper expressing his own intention not communicated, said the purpose was to devote the estate to a charitable purpose, the devisee might object that he had taken under a will well executed. But that is perfectly different from the case of a devisor expressing in the paper a trust which, by contract with the devisee, led to that devise."

The fact that there was some promise on the part of the devisee was important, and he was compelled to answer the bill, so as to admit or deny the promise, or, as I understand the case, the communication to him of the testator's intention from which a promise would be inferred. This case was in reference to a devise to charitable uses, which were void in the same manner as devises, etc., are void under section 1866, *supra.* "The case would be different, however, if the devisee had induced the testator to give him the estate absolutely, under an assurance that the unattested paper was a sufficient declaration of the trust for a charity, or under a promise, either express or implied by silence, that if the estate were devised to him, he would perform the trust. * * * But if the will is first made in favor of A and B, and the secret trust is then communicated only to A, the gift will be fixed with a trust with regard to A, but not with regard to B." See I. Jarm. Wills, pp. 438, 439, and cases cited.

The trust which renders the devise void is founded on a promise, either express or implied from silence. Is there any authority on which I am at liberty to rely which applies a different rule to cases like the one before the court? In *Taylor* v. *McRa*, 3 Rich. Eq., at page 106, the Court of Appeals in Equity, Chancellor Wardlaw, delivering the opinion of the court, uses the following language: "It is said, however, that the gift to the plaintiff being on the contingency expressed in the will (that the previous devise to the illegitimate children should be declared void by any court in this State authorized so to decide), affords indubitable evidence of the purpose of the testator to evade the act of 1795. It may be conceded that such was the purpose of the testator, if to keep the provisions of the will out of the operations of the act can be called an

evasion; but surely it is not the province of the court to usurp legislative power, and extend the act to cases not within its enactments. The act does not declare void gifts to a stranger by an adulterer, or the father of bastard children, and it may be well doubted whether such abridgemnt of the *jus disponendi* would ever have met with favor of the legislature.''

It is for the legislature, and not for us, to correct any supposed mischief in the present law on this and all subjects. ''It is here held that a mere purpose on the part of the testator, admitted to exist, cannot render the devise void.'' Even the dissenting Chancellor Dargan says: ''If there were a direct and secret understanding between the testator and himself that he should hold for the benefit of the illegitimates, on proof of that the gift to him would be vacated on application of the wife; but as regards Taylor, no such fraudulent intent or violation of the act appears on the face of the will. The moral obligation he might or might not fulfill, as his own sense of duty or honor might dictate.''

In this case, as in those with respect to charities, it seems to be regarded as settled law, that the unlawful trust must be expressed in the will or other writing, or then by parol, by bringing home before the death of testator the unlawful intention to the donee, and his acceptance or acquiescence by silence when communication is made to him. The case of *Belcher* v. *McKelvey*, 11 Rich. Eq., 9, is one which arises under the act of 1841 in reference to the emancipation of slaves. It is true, it is said in the syllabus, ''Where a gift of slaves is made by the donor in contravention of the act of 1841 against emancipation, the gift is void, whether the purpose of the donor is communicated to the donee or not.'' In the Circuit decree, Chancellor Wardlaw states the above proposition, but says that the conclusion, however, does not rest on any such doubtful propositions, and on an acceptance of the trust, by holding the defendants liable for the acts of George, the slave, who acted as his agent in the transaction. The Court of Appeals in Equity, by Chancellor Duncan, shares in the apprehension of the Circuit Chancellor, as to the ease with which the act can be evaded, if necessary to bring home to the donee a knowledge of the unlawful purpose,

but proceeds to place its judgment on its true grounds—a knowledge of the unlawful purpose brought home to the donee.

I do not see so clearly how the case of a voluntary donee, who takes in derogation of the legal rights of creditors, can be considered as analogous to this. The heirs and distributees have no rights to a decedent's estate, which he may not defeat at his will and pleasure. Creditors, on the contrary, have a right to proceed against the property of their debtor. When the sale is for valuable consideration, the purchase money is supposed to stand in the place of that which is sold. If there is an intent to defraud the creditor, and this is communicated to the purchaser, his deed is void. If not communicated, his deed is good. In voluntary deeds, no fraudulent intent is necessary, in order to avoid the deed as to creditors. 8 Am. & Eng. Enc. Law, 752, note 7.

I, therefore, regard the law as settled in these cases, that in order to render the devises and legacies of this kind void, the unlawful intent must appear in the will or other writing in due form, or then by parol declaration communicated to the donee, at least, in the lifetime of the testator or donor. My conclusion from the testimony is, that it was the purpose of Briggs that Louisa C. Massey and her three illegitimate children should have the use and benefit of the gift to the defendant, James L. Clarke. It has not been proved to my satisfaction that Clarke had any notice of this purpose during the lifetime of Briggs, or made any promise to carry out such trust. Clarke denies the statement of Huckabee as to any conversations with him ; but if all Huckabee says is true, he does not anywhere say that Briggs told him (even if that were evidence) that Clarke had notice, or that Clarke admitted to him that notice of the trust was communicated to him by any one in the lifetime of Briggs. What he may intend to do hereafter, is nothing to the purpose, and he was not required to say when on the stand. Clarke's credibility as a witness was not impeached, and even in a case where he has much to gain, I do not feel at liberty to reject his testimony.

Why put testamentary dispositions in writing, and have that writing carefully and solemnly attested in the presence of wit-

nesses, if without any agreement, or notice, or procurement on the part of a donee, the gift may be swept away by parol declarations to third parties, uncommunicated to the donee? If writing is necessary to guard the provisions of a lawful trust from the uncertainties of parol testimony, why should parol testimony be allowed to defeat a lawful trust, or lawful gift, when the innocent donee has never had any notice of the alleged unlawful trusts, and has no means to protect himself, which notice would have afforded?

I have reached my conclusion, after much consideration, and I may say regret, but I must interpret the law, and not undertake to modify it so as to accord with any sentiment of my own as to what the defendant Clarke ought or ought not to do with the property. It is, therefore, ordered and adjudged, that the complaint be dismissed.

The plaintiff appealed on the following grounds:

1. For that his honor erred in holding that the declarations of Benjamin F. Briggs, the testator, as to the unlawful purpose and intention with which he devised the balance and residue of his estate to the defendant Clarke are not admissible to affect Clarke, unless knowledge of such unlawful purpose and intention was brought home to Clarke before the death of the said Briggs.

2. In holding that, in order to avoid a devise or bequest, as in violation of sections 1866 and 1785 of the General Statutes, there must have been a promise by the devisee to the testator, either express or implied from silence, to carry out the unlawful purpose and intention for which the devise was made.

3. Because his honor, having found, as matter of fact, that it was the purpose of Briggs that Louisa C. Massey and her three illegitimate children should have the use and benefit of the gift to the defendant, James L. Clarke, should have found, as matter of law, that the purpose of Briggs, by any means whatsoever, to defeat, evade, and nullify the provisions of the bastardy act (section 1785 of the General Statutes of South Carolina), was a fraud, not only upon the lawful wife and legitimate children of Briggs, but upon the legislature of South Caro-

lina, and that the bequest to Clarke was void at the election of the wife and legitimate children, whether the purpose and intention of Briggs to perpetrate a fraud upon the law was brought home to Clarke in the lifetime of Briggs or not.

4. For that his honor erred in failing to construe together sections 1866 and 1785 of the General Statutes of South Carolina, both being applicable to the case.

5. In holding that, in order to render devises and legacies of this kind void, the unlawful intent must appear in the will, or by parol declarations communicated to the devisee or legatee in the lifetime of the testator.

6. In holding that, although it was the purpose of the testator Briggs that Louisa C. Massey and her three illegitimate children should have the use and benefit of the gift to the defendant Clarke, the said bequest was not, therefore, void, if it appear that the said defendant had no notice of the unlawful purpose in the lifetime of the testator.

7. In not finding from the evidence that the defendant Clarke had notice of the unlawful purpose of the gift to him, under the will of Briggs, before the death of the testator, and in not finding that the said defendant accepted the legacy after he had received such notice of the said unlawful purpose.

8. In ruling that the interrogatory propounded by counsel for plaintiff to the defendant Clarke, as to what disposition he intended to make of the property devised and bequeathed to him under the will, was irrelevant and not competent, and that the defendant Clarke was not bound to answer it.

*Messrs. W. B. McCaw* and *J. K. Alston*, for appellant.

*Messrs. Wilson & Wilson*, contra.

November 17, 1892. The opinion of the court was delivered by

MR. JUSTICE POPE. Benjamin F. Briggs, while a citizen of this State, having a living wife and two children, caused a last will and testament to be prepared for him, by the terms of which he left $50 to each one of his children; provided, that one-fourth part of his whole estate, after payment of debts,

should be equally divided amongst three bastard children, said to have been borne to him by Louisa C. Massey; and that the balance of his whole estate thereafter remaining should vest absolutely in his friend, James L. Clarke. Upon Briggs' death in 1885, he left such will unrevoked. His daughter, Mrs. Gore, as plaintiff, now seeks to avoid the payment, by the executors of her father's will, of the balance of his estate to James L. Clarke, upon the ground that he was to receive the same upon a secret trust for the said Louisa C. Massey and her three children. Judge Fraser heard the cause at March term, 1891, of the Court of Common Pleas for York County, upon the pleadings, testimony taken before him, and deposition of an absent witness, and, by his decree, denied plaintiff the relief prayed for, and dismissed the bill. From this decree the plaintiff appeals upon several grounds.

It is not denied that B. F. Briggs died survived by his widow and two children, and that for a number of years before his death he had sustained unlawful relations with Louisa C. Massey, and that she bore him three children. Under the laws of this State, he was allowed to give by will, or otherwise, not more than one-fourth of his estate to Louisa C. Massey and her children. If, however, he attempted to provide a larger portion of his estate than one-fourth for them, his wife or children could defeat such increased gifts or devises. It is not claimed here that such illicit offspring are given directly more than such one-fourth of his estate, but it is strenuously urged that the bequest to James L. Clarke is upon a secret trust for such illegitimate children. Here is the contention. Judge Fraser in his decree finds it as a fact that the testator's purpose was that Louisa C. Massey and her three illegitimate children should have the use and benefit of the gift to James L. Clarke, but he declines to enforce any trust as to such gift, as against James L. Clarke, upon the ground that he is not satisfied from the testimony before him that James L. Clarke, during the lifetime of the testator, had ever been informed of the testator's intention to create such a trust. The several grounds of appeal urge that the Circuit Judge was in error.

It is suggested that sections 1785 and 1866 of the General

Statutes render any provision, directly or indirectly, made in favor of illegitimate children, over one-fourth of the net estate, void, when the purpose of the testator is established, even if the stranger beneficiary did not know before death of testator of the trust intended to be attached by the testator to his bounty. Again, it is contended that the Circuit Judge erred in deciding that the testimony in this case failed to establish a knowledge by James L. Clarke, during the lifetime of the testator Briggs, of the secret trust attached by testator to his (Clarke's) bequest.

We will not undertake to review the decisions of this court rendered in construing this provision of our laws. We are content to adopt the language of that great jurist, Chancellor Johnstone, in announcing the judgment of the court in the case of *Bradley* v. *Lowry*, Speer Eq., 1: "I regard the statute as remedial, and I conceive that it should be so construed as to suppress the mischief contemplated by it;" but, as was said by the same chancellor in *Hull* v. *Hull*, 2 Strob. Eq., 188: "In considering the act with reference to its general intention, it must be remembered that there are few rights more valued by the citizen, or more uniformly respected by the legislature (of which we have abundant evidence in this very statute), than the *jus disponendi;* and no construction in abridgment of this right can be conformable to the spirit and intent of the act, except when the abridgment arises necessarily from the application of the act to the cases which it describes, or becomes necessary in carrying its provisions into effect, as provisions of a remedial statute." As was said by Chief Justice McIver in *Massey* v. *Wallace*, 32 S. C., 154, in reference to this provision of our law: "Its terms are very sweeping, and it forbids a person having a wife or lawful children from giving to a woman with whom he lives in adultery, or to his bastard children, more than one-fourth of the clear value of his estate, either by deed or will, or by any other ways or means whatsoever." Both parties to this controversy admit all these provisions and the effect given to them in the many decisions of our courts in construing them.

But it is contended by the appellant here, in the first place,

that the testator has attempted to evade the law, and that such attempt must be decided to be unavailing, because the Circuit Judge has decided that such was his purpose, notwithstanding it is contended by the respondent, James L. Clarke, that he had no information of such illegal intention of the testator in his lifetime. The case relied upon by the Circuit Judge to support his view, that if Clarke did not have information of testator's intention before his death, his bequest must stand, is that of *Taylor* v. *McRa*, 3 Rich. Eq., 90. In the last mentioned case, by the express terms of the will of McRa, a provision was made in favor of a stranger, Taylor, coupled with a request in these words: "to his special kindness and attention I commit my beloved daughter and son [both illegitimate], and invoke for them his most kind attention and protection." McRa had a wife living at his death, though she had been separated from him for more than thirty years. This wife was a lunatic, her estate being managed by a committee; he had no children, but had several grand-children. The decision of the court was, that there was no trust raised by the use of the words of the testator in giving Taylor in fee simple three-fourths of his estate, notwithstanding the use of the words quoted above, "to his special kindness and attention I commit my beloved daughter and son," &c.

In the case of *Taylor* v. *McRa*, *supra*, it will be discovered that the court construed the words of the will on its face—there were no circumstances outside of the will relied upon to create any trust in the bequest to Taylor—and the court held: "It is not pretended that there is any secret trust on the part of the plaintiff for the illegitimate children, and it is conceded that the gift to the plaintiff makes him the absolute proprietor of the estate, unless the terms of the will create an express trust. The course of courts of equity, of late years, has been against the conversion of legatees into trustees, by vague expressions of wishes or recommendations in the disposition of the estate (*Sale* v. *Moore*, 1 Sim., 534; *Meredith* v. *Heneage*, *Ibid.*, 542; *Wright* v. *Atkyns*, 1 Tur. & Russ., 143); and here there is nothing more than a commendation of his children by the testator to the kindness and protection of his executor, without refer-

ence to the estate, and after a contingent gift thereof in fee."
We have quoted thus freely from that decision to show that
the court, in the case relied upon, expressly decided that the
words of the will created no trust, and expressly announced
that there was no reliance upon any *secret trust.* Under such
circumstances, we are at a loss to perceive the force and effect
given by the Circuit Judge to the case of *Taylor* v. *McRa.* It
does not pretend to apply to the cases of secret trusts; on the
contrary, it guardedly avoids deciding such a case. We must,
therefore, look elsewhere for the principles to govern us in the
true construction to be applied here.

No one for a moment gainsays the proposition that a man
can give his property to a stranger at the sacrifice of the claims
of those who should be nearest and dearest to him. In
our private judgment we may denounce him for his dis-
regard of his own blood, but yet it is his right, and he
may exercise it if he sees proper. The view that is to be con-
sidered is, has a man a right to circumvent the law by means
of a bequest to a stranger, coupled with a secret trust for his
illegitimate children? and we do not propose to lose sight of the
true point in issue. Again, we remark that the Circuit Judge
in this case has found as a fact from which there is no appeal,
that Briggs, the testator, intended this bequest to Clarke to
enure to the benefit of his illegitimate children to the exclu-
sion of his own legal offspring. The laws of this commonwealth
declare null and void any gift, devise, or any other device
whatsoever, whereby a person intends any more than one-fourth
in the clear of his estate to go to his illegitimate children, pro-
vided the wife or child alone can raise the question. This
scheme was most cunningly devised; the respondent Clarke
says he knew nothing of it during the lifetime of the testator.
If the testator's personal representative was making this ques-
tion, it is easy to see that he would fail. But the contest is
made by the child of testator, not through him but against him;
that child seeks now, not what such testator provided for him,
but rather an estate that the law gives such child as a penalty,
so to speak, for an effort to nullify its provisions. There is not,
nor can there be, any valuable consideration moving from Clarke

in regard to this bequest; he is nothing but one who has found, if we could adopt his views, a valuable treasure, without trouble or expense, at his hands. It is possible that, if the contest were between the illegitimate children and himself, there might be some virtue in his position, but not so as to the legitimate children of Briggs, the testator.

We have no decision directly bearing upon this precise point arising in the construction of the bastardy act. There are some very strong expressions that occur in the decree on the circuit by Chancellor Wardlaw, and in the judgment rendered by the Court of Appeals in the case of *Belcher* v. *McKelvey*, 11 Rich. Eq., 9. In this last case, it seems that one Robert Tucker, of Laurens, had eight negro slaves. In April, 1854, he made a deed to W. W. Belcher, of Abbeville, in consideration of $1,000, for one of the slaves, George, by name, but in June, 1854, he made a deed, for the consideration of love, good will, and affection for his friend, W. W. Belcher, and $50, for the seven slaves still remaining, reserving a life estate in himself. The proof showed very clearly that the grantor did not even know W. W. Belcher, but had heard he was a good man. It was also made evident that the purpose of Tucker, who was 80 years of age, and very much under the influence of his negro slaves, was to have his slaves emancipated. The legislature of this State, in 1841, had enacted a law by the provisions of which any deed or bequest of negro slaves to another, either upon the expressed condition that they should be emancipated by the grantee or legatee, or upon any secret trust for that purpose, was declared null and void, and that such property, upon proof of such illegal purposes, should vest in the personal representative of such donor or testator, if needed to pay his debts, or, if not so needed, should be vested in his distributees or next of kin. McKelvey, as administrator of Tucker, after his death disregarded the deed for the seven negroes to Belcher, and thereupon Belcher filed his bill in equity. Without repeating the testimony, we may say it was clearly established that Tucker had importuned person after person in Laurens to accept a deed for the negroes under this trust, that they should be emancipated; and Belcher admitted

that he regarded himself bound by an obligation of this character, notwithstanding he was personally unacquainted with Tucker, and had received no communication from him. The Court of Appeals decided that Belcher was entitled to hold George, having paid full value for him; but that the remaining slaves should be delivered up to the persons entitled thereto under the provisions of the act of 1841.

No doubt exists that the legislature intended by its provisions to protect the public interests, but it will be observed that any property recovered under its mandates should vest as the law would have vested it if the donor or testator had not attempted to evade the law. In the Circuit decree of Chancellor Wardlaw, when he comes to discuss the effect of the sections of the act of 1841, upon sales and voluntary donations of slave property on trusts declared unlawful by its provisions, he points out very suggestively, what may prove an important feature of the law in the proper decision of the case at bar. He says: "I suppose *a sale* [italics ours], on the unlawful trusts mentioned in the second and third sections of the act of 1841, particularly the latter section, is no less liable to be declared void than a voluntary donation; *although there is more influence in a mere gift than a sale in aiding the implication of the trust itself* [italics ours]. It is not clear, when the donee is a mere volunteer, that it is not enough to bring the gift within the scope of the act, *that the donor certainly intends an unlawful trust* [italics ours], *although the donee may not be fully cognizant of it.* If the trust be not executed, the donor is defrauded; and whether it be or not, there is an attempt to defeat the policy declared by the legislature by the enactment. It is difficult to convert one into a trustee without his consent, and the trust under the act must always be in the donee, and merely the creation, or attempt at creation, of the trust on the part of the donor; still *a donee, or other person*, should not be allowed to take advantage *from the fraud of another*, and one may naturally suspect fraud, or purpose to create a trust, when unreasonable and extravagant bounty is conferred on him by a stranger."

We should be candid, and state that, notwithstanding this reasoning on the part of the chancellor, his conclusion of this

branch of the case was not rested, as he expressed it, "on such doubtful propositions." When this case reached the Court of Appeals, Chancellor Dunkin, referring to the matters just quoted from the Circuit decree of Chancellor Wardlaw, said : "And I share in the apprehension of the Circuit Chancellor, that the purposes of the act might be easily frustrated, if it were necessary to bring home to the knowledge of the voluntary donee the unlawful designs of the donor. In the analogous case of a voluntary deed in fraud of creditors, it is not necessary to establish the *scienter* on the part of the donee. In Story's Equity, section 351, the authority of Pothier and other civil law writers is cited for the doctrine applicable to this class of cases. It was the rule of the civil law to avoid all alienations or other dispositions of their property made by debtors to defraud their creditors. Hence all such dispositions were annulled, whether the donee knew of the prejudice intended to the creditors or not. In the language of Pothier, the inquiry is not whether he to whom the gift was made knew of the intention of the donor, but only whether the creditor was defrauded. The voluntary donee has no cause of complaint except that he is not permitted to enjoy that which the donor had no right to give away." Here, also, candor requires us to say the Court of Appeals did not base their decision upon this reasoning, for they found that Belcher had knowledge of Tucker's unlawful intentions.

Why should we say the act of 1841 was aimed to suppress conduct prejudicial to the public, and deny the same virtue to the bastardy act of 1795? The fruits or penalties in each enured to the benefit of private persons. The mischief which was designed to be corrected related to the public in each act. Why is not the preservation of domestic happiness and the suppression of illegal conduct in husbands and fathers as closely allied to the public interests as the preservation of a domestic institution such as slavery? The bastardy act, while designed to preserve the rights of the wife and children, in those cases where an unjust preference by the husband or father of his mistress or illegitimate children might lead such husband or father to give more than one-fourth part of his net estate to

such illegal connections of his, was also designed to teach the citizen lessons of virtue and morality.

In the case at bar, if the legatee Clarke was not apprised of the illegal purpose of the testator, would it not be a fraud upon such testator if this legatee claimed this property as his own absolutely? Being a voluntary stranger, no consideration moved the testator to bestow this gift upon him. It is impossible for Clarke, under the facts developed at this trial, to rest under any other conviction than that Briggs, the testator, coupled with the gift an obligation to use it for the benefit of his illegitimate children, for whom he had already in his will provided to the limit allowed by law. If he should disregard this palpable intention of his benefactor, he would be lost to all shame. If he should regard it and execute it, he thus contravenes the positive laws of his country forbidding such a course. Under our view of the law, he shall not be required to elect either course. We feel it our duty to adjudge, it having been established in this case that Briggs, the testator, intended the gift to Clarke to be for his illegitimate children, that all the estate that was given to James L. Clarke under the will of Briggs shall be paid to the widow and two children of the testator by the executor, J. F. Wallace. Having reached the foregoing conclusion, it is unnecessary for us to discuss any other propositions of law or fact herein involved.

It is the judgment of this court, that the judgment of the Circuit Court be reversed and that the action be remanded to the Circuit Court, with directions to enforce by suitable proceedings the conclusions herein announced.

MR. JUSTICE McGOWAN concurred.

MR. CHIEF JUSTICE McIVER. I dissent, and am willing to rest my conclusion upon the reasoning employed by the Circuit Judge.