RUSSELL v. JONES et al.

(Circuit Court of Appeals, Fifth Circuit. February 21, 1905.)

No. 1,398.

TESTAMENTARY TRUSTS—VERBAL AGREEMENT OR PROMISE BY LEGATEE—EVI-
DENCE TO ESTABLISH.

Conceding that a contract or promise by a legatee to make a certain
disposition at his death of property bequeathed to him absolutely, which
a court will enforce after his death, may be established by parol evi-
dence, such evidence must be very clear, and the contract or promise
itself must be definite and certain in its terms, so that, if not carried
out, a fraud would be perpetrated upon the testator. Evidence consid-
ered, and *held* insufficient to establish such a verbal contract between
a husband and wife in behalf of the wife's sister, or to show any such
fraud on the part of the husband, as his wife's residuary legatee, as
to authorize the court to enforce the sister's claim against his estate in
the hands of his executors.

Appeal from the Circuit Court of the United States for the Northern
District of Mississippi.

Tim E. Cooper, for appellant.

Jas. W. Gray and Jno. W. Fewell, for appellees.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. Mary B. Russell, the appellant, was
the surviving sister of Martha Bliss Warren, deceased, and her nearest
of kin. The appellees are the executors of the will of John A. Warren,
deceased. John A. Warren and Martha Bliss Warren were married
about 1880. She had been a widow for a number of years, and had
a considerable estate, which she was much interested in managing,
and managed with skill. He had a larger estate, and they chose that
their separate estates should be kept separate, and that she should con-
tinue to manage hers, which she did during their joint lives, keeping
both the corpus and its income separate from the corpus and income
of her husband's estate. She died in December, 1899, testate. In her
will her husband was named as the executor, in which capacity he came
into possession of her estate, and as her residuary legatee he received
the greater portion of it in absolute ownership. He died March 24,
1901.

The bill in this case avers, substantially, that John A. Warren repre-
sented and promised to his wife, Martha, that if she would make a last
will and testament devising to him the bulk of her estate, after giving
some specific legacies to certain friends and relatives, that he would at
his death, by his last will and testament, give to complainant so much
of the estate as was then remaining in his hands and not spent in his
comfortable, decent, and necessary support; and that his wife Martha,
having confidence in her husband, and induced by these promises, exe-
cuted her last will and testament, giving the greater part of her estate
to him; that, but for the promises made by John A. Warren, his wife
would have provided by her will for the ultimate gift of her estate to
the complainant, who was her sister and nearest of kin, which fact was
well known to John A. Warren, who induced and persuaded his wife

to make a will devising and bequeathing the greater part of her estate to him, upon his solemn promise and agreement to make and leave a will giving so much of said estate as should remain unexpended in his reasonable and comfortable support to the complainant; that John A. Warren received under the last will of his wife, and upon the promises hereinbefore set forth, an estate of $30,000, which estate remained in his hands at his death, unimpaired and undisposed of, except by the gift by him to complainant of $6,500, which estate it was the duty of John A. Warren, and by the contract and agreement with his wife he was legally and equitably bound, to bequeath to complainant, but which property, in violation of such agreement and contract, he devised to others. The bill prays that an account may be taken of the amount and value of the estate received by John A. Warren under the last will and testament of his deceased wife which remained in his hands at his death, and that a decree be rendered against the executors and trustees for the full value thereof, with interest thereon at 6 per cent. per annum from the 24th day of March, 1901, the day of the death of the said John A. Warren, and costs of court. The appellees answered the bill fully, and appellant joined issue by a general replication. The case proceeded in due order to a hearing in the Circuit Court, and that court passed the decree from which this appeal is taken, announcing therein its opinion and judgment that the complainant had failed to make a case for relief in the premises, and that she is not entitled to relief, and adjudging and decreeing that her bill and suit be dismissed out of court. The judge filed a written opinion, which the assignment of errors practically treats as a part of the decree.

The errors assigned are: (1) That the court erred in holding that the complainant by her pleadings, and evidence introduced in support thereof, sought to contradict the terms of the will of Mrs. Warren by parol, while the bill of complaint does not contradict the will, but seeks only to show a collateral parol agreement on the part of Dr. John A. Warren, the testator of the appellees, in consideration whereof the will of Mrs. Warren was executed or permitted to remain unrevoked; (4) that the court erred in giving consideration to only a part of the testimony for the complainant (specifying particulars fully); (6) that the court erred in considering incompetent and illegal testimony (specifying particulars); (11) that the evidence introduced by the complainant established the contract averred in the bill, and the will of Dr. Warren established its breach, and the court should have decreed accordingly. There are thirteen errors assigned, but they are all, we think, substantially embraced in those we have specified.

It has been said that in passing upon a case brought before an appellate court on writ of error the judge of the lower court is on trial, while in a case on appeal the case itself is on trial. With that distinction in view, and without intending the least disrespect to the very distinguished solicitor who represented the appellant in this case, we will treat his assignment of errors as a warning to us to avoid the mistakes which it appears to him the other judge has committed in the trial of this case.

It is urged for the appellant that only one question of fact is presented by the record, and that is whether the contract alleged in the

bill has been proved by the testimony. It is assumed that, if the contract is established by the testimony, the complainant is entitled to relief; if not in a court of equity, then in her suit at law for breach of contract. Her suit was brought in the state court having full jurisdiction of the whole subject, both at law and in equity, and upon removal to the Circuit Court the pleadings were adjusted to the jurisdiction of that court. The assumption just referred to embraces the assumption that such a contract may be made and may be established by parol proof. Accepting this for the present, we proceed to consider the terms of the contract as averred, and the testimony offered to support it. It is in substance averred that John A. Warren and his wife, Martha, entered into an agreement by which each was to make a will in favor of the other, with the oral agreement or understanding that the survivor should by last will and testament leave to certain relatives of the one dying first all of the property which the survivor had at the time of her or his death, and which he or she had acquired from the one dying first; that is to say, if Mrs. Warren died first, then Dr. Warren was, under the alleged agreement, to make a will leaving to the complainant all the property which he acquired through the will of Mrs. Warren and which remained in his hands at the time of his death.

The complainant offered four witnesses on whose testimony she relied to establish the contract as averred. It relates to admissions made by John A. Warren before and after the death of his wife.

Martha Plummer, who was a nurse in the sanitarium at Glen Springs, Watkins, N. Y., acted as Dr. Warren's nurse first, and then as nurse of Mrs. Warren, and, after Mrs. Warren's death, on the second visit of Dr. Warren to the sanitarium, acted as his nurse and private secretary, and when he left the sanitarium continued with him in both capacities, from May to the latter part of September, says:

"I know that Dr. Warren and his wife made their wills for each other; the one surviving the other was to have the use of their property their lifetime, and that was in the will. Then they had a verbal contract that what remained of the property—Dr. Warren's property was to go to Dr. Warren's relatives, and what remained of Mrs. Warren's was to go to Mrs. Russell; and I got that information from them, both doctor and his wife. I know that each had their separate moneys and separate property. Each one made their will, and each one willed their property to the other their lifetime. That is, if Dr. Warren died before Mrs. Warren, she was to have the use of his property her lifetime, and then at her death what remained of his property was to go to his relatives. I mean his own property—personal property that he has always had. What was obtained from his wife was only his his lifetime. It was to go to Mrs. Russell, Mrs. Warren's sister."

Being asked to state her source of information, she answered:

"I was Dr. Warren's nurse, and also, might say, his private secretary, as I did all of his correspondence, and read all of his letters, and wrote all of them. And did or did not Dr. Warren himself tell you of this arrangement that existed between his wife and himself? He did. Was or was not the matter of agreement between Dr. Warren and his wife discussed by them in your presence? It was. Was it frequently discussed? Yes, frequently. I will ask you, Mrs. Plummer, to state once again, clearly and fully, the agreement made by and between Dr. Warren and his wife regarding their respective wills, as you understood the agreement from being told of it by Dr. Warren and his wife, and from hearing it frequently discussed between them? That they had made their wills in favor of each other; that Dr. Warren willed

his property and money to his wife to use her lifetime, in case he died first; and Mrs. Warren's was made the same way in favor of Dr. Warren; then at the death of one of them, say Dr. Warren, and Mrs. Warren outlived him, what remained at her death of Dr. Warren's property was to go to his heirs, and hers to Mrs. Russell; and if Dr. Warren outlived his wife, Mrs. Warren, that what remained of her property was to go to Mrs. Russell, and what remained of his to his heirs. Did Dr. or Mrs. Warren ever tell you how long this agreement or contract had existed between them? Yes, sir; they said they had made that verbal one when they made their wills. That was an understanding between them about dividing the property after the last one's death."

James K. King, a physician and surgeon, 50 years of age, residing at the Glen Springs, Watkins, N. Y., which Dr. Warren visited for his health, and where Dr. King attended him professionally, being asked:

"Please state Dr. Warren's physical condition while at the Glen Springs, general physical condition? His general condition was one of anæmia and neurasthenia (nervous prostration). Please state what, if anything, you know in reference to the contract or agreement existing between Dr. Warren and his wife having relation to wills to be made by them respectively and one in favor of the other? I do not think Mrs. Warren ever told me but once about this, but Dr. Warren was always talking about money matters; but I am sure Mrs. Warren only told me once; but the doctor talked a great deal about money matters, and very frequently told me the arrangement between himself and his wife. Mrs. Warren was a patient of our lady physician, so that I did not see her except in her last illness. Mrs. Warren told me that she had made her will in favor of the doctor, and that she was to leave all her property to him, and that at her death the property went to him, and that he was to use her property conjointly with his while he lived, and at his death all that was left of his property was to go to his heirs, and what was left of her property was to go to Mrs. Russell. Doctor told me exactly the same thing—that he had made his will in favor of his wife; that they had always kept their accounts to the smallest amounts separate, and at his death all his property went to her, and at her death what was left of the property, that it was to be divided so that all that belonged to her that was left of hers was to go to Mrs. Russell, and what was left of his property was to go to his heirs. State again, clearly and fully, what Dr. Warren stated to you about any contract or agreement which he and his wife had with each other in regard to their wills. The doctor stated to me many times that he and his wife had always kept their accounts separate, and that they had made their wills in favor of each other; that Mrs. Warren had made her will leaving all of her property to him—that is, the bulk of it— at her death, to be used conjointly with his as long as he lived; at his death the residue of the property was to be so divided; that what was left of that belonging to her originally would go to Mrs. Russell, and all that was left of what had belonged to him originally was to go to his heirs. When was Dr. Warren at the Glen Springs upon the second occasion? Dr. Warren came the first time the 21st day of May, 1899, and went away December 20, 1899; the second visit he arrived May 19, 1900, and left August 21, 1900. Upon the occasion of Dr. Warren's second visit to Glen Springs, New York, after the death of his wife, did he say anything to you in regard to this arrangement or agreement? Yes, sir; he said the arrangements were exactly the same, but he was more depressed, and did not talk so much about anything except his poverty."

On cross-examination:

"What was the condition of Dr. Warren's mind when he was here the first time? Very good. He was a weak man. He was an anæmic, and his nervous system was run down from lack of nourishment, but his mind was clear and active. Was he or not very talkative? He talked all the time. What did Dr. Warren tell you was the shape in which this arrangement

he had with his wife with reference to the disposition of their property? Did he say whether it was in the shape of a will or contract? It was my understanding that they had both made their wills. And that the conditions of the contract you have testified about were all contained in their respective wills? Yes, sir. Did Mrs. Warren, in the conversations you have testified about, tell you the conditions which were in her will? Yes, sir, identically the same thing."

Redirect examination:

"Doctor, do you undertake to state positively that Dr. Warren stated to you that his will and Mrs. Warren's will had been made? Yes, sir. Do you undertake to state positively that Dr. Warren told you that this arrangement he had made with his wife were conditions in their wills as made, or that it was an agreement in pursuance of which the wills were or to be made—a verbal agreement—and that their wills were to be made in accordance with this verbal understanding? I understood their wills were made. Did you understand that their wills set out in the body of the will this agreement between them; that the wills had been made in pursuance to this verbal agreement that Dr. and Mrs. Warren had entered into as to the disposition of their property? The talk had been long before the wills; that the wills were the outgrowth of the verbal agreement."

Percy B. Russell, a nephew of D. M. Russell and a nephew of the appellant by marriage, 41 years of age, resides in Memphis, Tenn., but spends most of his time in Mississippi, where he is engaged in the business of planting cotton. He testified in substance:

"I was at Glen Springs, Watkins, N. Y., soon after the death of Martha B. Warren. I accompanied Mrs. Mary B. Russell at the time that she made her visit to Watkins, N. Y., on her sister's death, and I saw Dr. Warren at that time at the sanitarium. Have known Mrs. Warren from my childhood; her father died some years before her death; her mother died before my birth. Mrs. Warren had just died a few hours before I reached Watkins. I accompanied Dr. Warren on his way to Mobile, Ala., with his wife's remains, going as far with him as Salisbury, N. C., where I left him and Mrs. Russell to go on their way to Mobile with Mrs. Warren's remains. I can best tell the condition of Dr. Warren's health and his general physical condition by stating the manner in which he met me, and his appearance. When I came into his room I found him sitting on the side of the bed with a dressing robe about him, and in the most dejected attitude, and with tears in his eyes he spoke to me and told me of the great loss he had sustained, and that he was barely able to stand at that time as he was talking to me. He sank back upon the bed in an agony of tears after he had told me some things in regard to his wife's death. After I first met Dr. Warren on my arrival at the sanitarium, I went to his room; I was there a while, and then went out, and Mrs. Russell remained with him for some time—perhaps an hour, or possibly more. On my return I went back again to Dr. Warren's room, and Mrs. Russell, shortly after I went in, went out. Dr. Warren then spoke about his condition; said he didn't know what he was going to do—that his wife had always helped him, but that now she was gone and he was left alone. He said that the servants he hired took his money and did little for him. I offered to do anything I could for him, and he then asked me to see about the arrangements in regard to his leaving there—in regard to the settlement of his bills, the purchase of a coffin for his wife, and anything else that was necessary to do before leaving there. I unpacked his trunks, in which he had stored his clothing and personal effects, unpacked Mrs. Warren's trunk, took down Dr. Warren's clothing from some pins or tacks, brought Mrs. Warren's clothing from an adjoining room, packed Dr. Warren's trunk and Mrs. Warren's trunk, and arranged the division of his and her personal effects under his direction, handling almost everything —you may say everything that Dr. Warren had and that Mrs. Warren had there at the sanitarium, with the exception of the clothing in which she was laid out and the clothing that Dr. Warren wore. Shortly after my re-

turning to his room after going to look after the baggage of Mrs. Russell, Dr. Warren approached the subject of his wife's property in this way: He said: 'Mary [meaning Mrs. Russell] thinks I ought to give that $10,000 of my money to her as Bliss money, but I paid that money, and that wasn't Bliss money; that was Warren money.' I then said to him: 'Doctor, don't let's talk about these things; I know nothing about them.' He said he must talk about them. 'I want to tell you.' Then he told me all, how he had used this money to the best of his knowledge, and that he thought that he had made a good investment for his wife; and told me of some loans that he had made for her to some commission company, and how they had lost it, and how he had repaid it to her; and, says he: 'I don't think this is Bliss money; I think it is Warren money.' Shortly after this Mrs. Russell returned to the room for a moment with the nurse to give Dr. Warren some medicine, which I learned afterwards he took at very short intervals of something like an hour—first one kind, then a second kind, then a third kind. The nurse went out, and Mrs. Russell soon after followed, and again Dr. Warren broke into tears, and in a complaining manner spoke of the way in which the physicians had treated his wife; told me that he wanted to go to see her, and begged me to help him into the room where she lay. So I accompanied him to the room where his wife was laid, and that was the first time I saw her. He was so feeble in going in there that I had to give him great assistance through the hallway to the room, and upon reaching there he broke down in a pitiful wail and cried over his wife, and told me again and again of how the doctors had butchered her; told me of how he always thought he would die first, and now that she was dead he did not know what he was going to do; that he must go back to Mobile as soon as he could; that he must go right away; and I tried to show him that he could not go away at once. He wanted to go that evening. He told me that he always knew that Martha would do what she promised to do; that he had always thought that he would die first; and then asked me if I thought that he ought to give Mary the Bliss money. I tried to make him stop talking on that line of talk, but did not remonstrate with him further than to try and put him off; but he in a broken way went on and told me he was going to do just what he had promised Martha that he would do, and ended up by kneeling and praying by his wife's bed that God would direct him to do what was right. He was in such a feeble and pitiable condition that I did everything that I could do to get him to go back to his room, and, as soon as I could do so, we returned. In packing his effects he had me put Mrs. Warren's things which she had owned before their marriage, or which she had purchased herself during their marriage, into her trunk. This was not only clothing and jewelry, but trinkets of every sort. Anything that he had given her he had put into his trunk; what she had received, as he told me, from her friends or from her family or former husband, were put in her trunk. The separation, as he explained to me, was that he was entitled to what his money had bought for her; but that whatever her money had bought, or her relatives or friends had given her, should go to Mrs. Russell, or to the special bequests she had made of this or that article, but that all of the residue, out of the special bequests, were to be given to Mrs. Mary B. Russell. He said that his wife had promised him that if he died first, or before she did, that all his property should go to the Warren heirs; that they had agreed that the Warren money should go to the Warren heirs; and that the Bliss money should go to Mrs. Mary B. Russell, her sister; that he knew that Martha would do as she had promised him, and that he could not wait for anything to go to Mobile and change his will in accordance with the terms —or the promise, I should say—which he had agreed or made with his wife; that he was very feeble, and that it took a large amount of money to support him and give him nurses; that if it were not for that fact he would give Mary Martha's money now; that Martha had told him that she wanted him to give Mary the note for, I think, $6,500, which she held against Mr. D. M. Russell; that he was bound to go, and that he could not wait at all, and that he must comply with, or fulfill, that promise. Dr. Warren told me repeatedly at the sanitarium that he and his wife had agreed that whatever one had left, the other should have the right of the property which the dying

one left, but for the use of that property which the dying one left during the life of the remaining one; but upon the death it should be returned to the Bliss family or the Warren family, as the case might be. He went on furthermore to tell me all; how it was that the $6,500 should be given to Mary at once, because, from some objection of Mrs. Warren to handling his estate in the event of his death, they had agreed that the note for $16,000 held by them against Mr. D. M. Russell should be given to Mr. Warren's sister—I think it was his sister; some member of the family—and that Mrs. Warren had thereupon said she was going to give to Mrs. Russell the $6,500 note. On the occasion at the sanitarium in which he spoke to me of these matters, he spoke very freely, and, finally, the last thing before leaving him in the berth of the sleeper going south from Washington to Salisbury, where I left him, he called me and expressed himself as being grateful to me for the assistance and kindness which I had shown him, and talked with me more rationally than at any time before, and assured me that he wanted me to think well of him; that he was going to do just what he had promised to do; that he was going straight to Mobile and carry out his agreement with his dead wife, and that Mary must not think that he was going to do anything else except to carry out the agreement of which I have spoken heretofore."

On cross-examination he was asked to state exactly what the agreement was—what he (Dr. Warren) said it was.

"I think I have stated it as well as I can state it. I don't think I could state it more accurately. Well, please state it again? That whatever property either one of them died possessed of should be held in trust by the remaining one—in trust, I mean, to be used by them; but the trust to be of the nature that it was to be disposed of according to the promise upon their death, and that the residue of whatever property they might then have of this property which they inherited, the one from the other, should be given, as the case might be, to the heirs or the family of Dr. Warren or of Mrs. Warren. Is that the agreement—what he said the agreement was? What he said the agreement as told me. Let me add one word here. Dr. Warren told me so many times during that day, the evening, the morning, and the afternoon, repeated it so many times, stating the same fact in different words, that for me to repeat his exact words in regard to it would be impossible, but for me to fail to understand and to know what he intended to tell me is impossible. What I want you to do is to state exactly what your understanding of the agreement was between Dr. Warren and Mrs. Warren, which you gathered from the statements of Dr. Warren to you while he was at the sanitarium at Watkins, N. Y. I cannot state it better than I have done. I don't see how I can get at it any better. I wish you would state the agreement exactly as you understood it? That if Dr. Warren died before Mrs. Warren, Mrs. Warren to have the use during her lifetime of all of Dr. Warren's property. That if Mrs. Warren died before Dr. Warren, that Dr. Warren was to have the use of all of Mrs. Warren's property during his lifetime. That upon the death of Dr. Warren that he should leave to Mrs. Mary B. Russell whatever he had left of the property which he had received from Mrs. Warren. That upon the death of Mrs. Warren she should leave whatever she might have remaining of the property left by Dr. Warren to his heirs."

D. M. Russell, the husband of the appellant, who was examined April 8, 1903, was then 66 years of age, and resided at Jonestown, Coahoma county, Miss., testified:

"How long before the death of Mrs. Warren was it that you last saw her? About a month, November 15th and 16th, at this place, Memphis, Tenn. She came on here to attend to some business for her husband and herself—he was an invalid. State what, if anything, you know in reference to a contract or agreement between Dr. J. A. Warren and his wife having relation to wills to be made by them respectively and one in favor of the other? Mrs. Warren stated to her sister and myself that she wished us to know her business arrangements—her property (hers and her husband's)—and it was agreed between them that each should leave their property to the other, with the general un-

derstanding and agreement that on the death of the other the other should then will the property received from the other to their respective heirs; that is, the Warren money was to go to the Warren heirs, his nephews and nieces, and Mrs. Warren's to her sister. That there had been a change made, and she wanted us to know of the change. He had originally left his property to his wife, seised to pay an annuity to his sister, Mrs. Moore. He now left Mrs. Moore the sum of $16,000 in lieu of that annuity. She stated that she had left her property entirely to him, but she would make a change in her will and leave Mrs. Russell the note of mine for $6,500. She stated that she had left her property entirely to Dr. Warren, without making any provision in her will, leaving it to him entirely or absolutely, so that he could have the entire use of it, and if he lived long enough to need it all she wanted him to have it, but that he would leave whatever there was to her sister at his death. That, she stated, was the mutual understanding. I asked her if it would not be best to provide for that agreement in her will; she replied: 'Dr. Warren is an honorable man, and will do as he agreed.' Where did this conversation, as to which you have been testifying between Mrs. Warren and her sister in your presence, occur? In Caston's Hotel, in the city of Memphis, Tenn. Dr. J. A. Warren was not present on that occasion? No, he was sick at the sanitarium. You say that Mrs. Warren stated on that occasion that Dr. Warren's will, as it had been drawn, leaving Mrs. Warren his estate, changed (charged?) the annuity in favor of his sister, Mrs. Moore, and that a change had been made by Dr. Warren, giving to his sister a stated sum of $16,000 in the place of the annuity, and that Mrs. Warren, for that reason, intended to make a change in her will, giving to her sister, your wife, as a certain note which you owed to Mrs. Warren for about $6,500? Yes, she stated that it was her intention to make that change. When and where, after these conversations, was it that you saw Dr. Warren, if at all? In Mobile, about a month later. He returned with his wife's body to Mobile about December—somewhere, I think, about the 15th or 20th. What had been the condition of Dr. Warren's health for several years preceding his death? He had been an invalid. Do you know from what disease he had been suffering? Neurasthenia. He had, however, a combination of diseases, but that was given to me as the principal trouble. Dr. Master told me this. What were the manifestations of the disease of Dr. Warren which were apparent to a nonprofessional person? At times great irritable nervousness. State whether or not he required constant attention? Yes, he had trained nurses and required constant nursing. He had a trained nurse sometimes, but generally a negro who waited on him. He had nurses for several years. State whether or not you saw Dr. Warren in Mobile after the death of his wife and before her burial? I met the train at Mobile which he (Dr. Warren) and his wife's body arrived on. Dr. Warren, very shortly after reaching his boarding house, brought up the subject of his wife's property. Mrs. Russell had gone to Watkins, and had returned with Dr. Warren. He said to me, 'Dave, Mary (that is my wife) thinks that her sister left her property to her; that I was to hand it over to her.' I said, 'No, Doctor, Martha told us the agreement in reference to her property, and she does not think so.' He said, 'Well, now, I am going to have Martha's will brought here and read to you.' He said, 'So that you can see that she gave the property to me.' He had to send to Mr. Jones to get the will. Now I am giving the particulars as I remember they occurred. Some of it was that evening, and some of it was the next evening after her burial. She was buried about 11 o'clock, but he brought the question up every time it was discussed. I endeavored to keep him from discussing it, thinking it would do him injury in his condition. After Mrs. Warren's will was read, I said: 'Doctor, that is exactly as your wife told us; but she said that it was agreed between you that you were to have the use of her property, but were to make a will leaving it—whatever there was of it—to her sister on your death, just as she was to do with your property, leaving it to your heirs on her death, if she had survived.' He said, 'Yes, yes, that is right, I am going to do it,' and was extremely anxious to make a will. We endeavored to have him delay it, thinking it might injure him. He was excited and very much distressed. I had a consultation in reference to it with Mr. Winston Jones (one of the appellees). Mr. Jones

said that he believed the worry and anxiety that Dr. Warren was going through, because he stated: 'If I should die, and I am liable to at any time, as my heart is affected, Mary would not get Martha's property as it is agreed she should, but it would go to my heirs'— Mr. Jones stated that he thought the making of the will would have a less injurious effect on him than the anxiety and worry that he was going through, fearing that Mary would not get, as he termed it, 'justice'; 'her rights,' as he expressed it. I then said to Dr. Warren at that time what Mrs. Warren had stated to us in relation to her property, and said, 'Doctor, Martha said that when she got back to Mobile she would change her will, and leave my note of $6,500 on her death, as you had made a bequest direct to Mrs. Moore.' I said, 'She is, of course, dead, and had not made that change.' He said: 'That is all right; she told me about it, and I am going to carry out Martha's wishes.' He had Mr. Winston Jones, who had charge of the papers, get the note and bring it to his room. He indorsed it over to Mary, and handed it to her. Dr. Warren admitted fully the conversation and agreement with his wife, as she had told it to her sister and myself, and made a will according to that understanding. There was a dispute, however, in regard to $10,000. Not long after their marriage Dr. Warren wished to make a loan to J. P. Pettite of this place (Memphis, Tenn.), an old friend of his, and he didn't have the money. Mistress did have the money on hand, and he wished to loan her money. She objected because he wished to make the loan without security. He said, 'Very well, if I will be security, will that satisfy you?' She said, 'Certainly.' He made the loan, and made a similar one to Gardner and Copp under similar conditions— Gardner and Copp of New Orleans. He met a loss of $10,000 in the two loans. He paid this money back to Mrs. Warren, as he had agreed. In the conversation prior to making this will, which he had with me in his room in Mobile, he said, 'Now, Dave, I am not going to give Mary that $10,000, because it is Warren money,' although I pointed out to him that it was Bliss money, because he had loaned Bliss money, and he was himself responsible. With that exception in reference to that, he acknowledged fully Mary's right to her sister's property. He made a will, I think, the day following the burial. I think Mr. Bestor drew the will. By that will he bequeathed to Mrs. Russell on his death the estate which Mrs. Warren had bequeathed to him, other than the $10,000 just referred to. He mentioned this matter to me repeatedly; first soon after getting to his boarding house that evening. He spoke of it more than once that night before he retired, and again the next morning the first thing. I am not clear in my mind whether he made his will on the evening of the burial of his wife or the morning following, but I am of the impression it was the next morning; but he was insistent. I think the agreement about making the mutual wills had existed ever since they were married. She had been a widow and had her own estate, and had charge and control of her own property. I think they entered into that agreement soon after marriage. She had spoken to me about it years before her death. I cannot state as to the time of making this agreement from what I learned from Dr. Warren and not from Mrs. Warren. Before the conversation I had with Dr. Warren at the time of his wife's death, he had discussed the matter with me, not in the early part of their marriage, but a few years afterwards, visiting me on the plantation—I had bought out Dr. Warren's planting interests, his half—we were owners of the property together; I had bought it out and made cash payments, and gave him my note for $16,000 for the balance. We had hard times with an overflow for three years in succession. He was explaining to me in a business way. He said, 'Dave, don't be uneasy about that note, for I am not going to press you, and if I should die my estate all goes into Martha's hands.' He then spoke about the agreement. He said, 'You know she won't press you.' He said later that he did not want the money, and asked me to keep it and use it. It was in relation to that that Mrs. Warren came here. I objected to paying 8 per cent. interest, as I could get money at a lower rate. She took up the old note, and I gave a new note at 6 per cent. I knew from what Dr. Warren said at these anterior periods how the wills were to be drawn, and that the general arrangement was the same which existed when Mrs. Warren died, with the exception of the annuity. There was a direct bequest to Mrs. Moore. I will say that Dr. Warren

has always discussed all of these matters freely with me; we became intimate friends, as well as being connected by marriage."

On cross-examination:

"Mr. Russell, when was this agreement or contract that you have testified to, that Mrs. Warren stated had been made between her and her husband, Dr. Warren—— When was this agreement made? She didn't give the positive date; just stated it as a fact. She didn't tell me when they made the change in relation to the bequests. The only change was in the leaving of the annuity which had been left to Dr. Warren's sister, Mrs. Moore—changing it—leaving my note of $16,000 to Mrs. Moore, and the balance to go into her hands as long as she lived; and that she had made a like agreement, but that it had been made since she last saw me. When had she last seen you? I cannot now recollect. Was it a year? Yes, about two or three years. I don't remember when I had seen her before that. Was it more than three years? I would not be willing to swear to any particular time. I cannot recollect now; I recollect very distinctly that we were at Grand Briar, White Sulphur, when she went over this entire agreement between herself and the doctor. This agreement that you have testified to, that she said that she had with Dr. Warren—that was here in Memphis? Yes, sir. This agreement that she had with her husband had been changed from a former agreement? Yes, sir. You don't know when the former agreement was made? No, sir; I cannot state about that. I wish you would state now in detail the exact agreement—exactly what the agreement was? She told me that she had willed all of her property to Dr. Warren for his use during his lifetime; that she left it to him absolutely, with the agreement and understanding that if she died first he would then make a will leaving on his death her property to her sister, Mrs. Russell, and that he had agreed the same way to leave all of his property to her, and she was to leave it to his heirs when she died. As I understood, you testified in your direct examination that Dr. Warren had by his original will—by some prior will—left all of his property to his wife, but an annuity to Mrs. Moore, but that that had been changed, and that, instead of leaving the annuity to Mrs. Moore, he had left her by his will $16,000? I think she said my note—it was $16,000 then. While she was here I paid part of the principal, leaving $16,000. You don't know when that change was made? I do not. As I said, she explained this to me in relation to my business about this note. What was it you said that Mrs. Warren stated in reference to changing her will and leaving to you, or to Mrs. Russell, the note of $6,500? She said, after making these statements about the change by Dr. Warren: 'I think that as he has made this bequest, that I ought to leave Mary a direct bequest, and when I go back to Mobile I will leave your note of $6,500 on my death.' But she never got to Mobile. You say that when you met Dr. Warren in Mobile after the death of Mrs. Warren, that he was very nervous? Very nervous, very much wrought up, carrying on, and almost hysterical at times; was blaming the doctors, and saying that they had killed her; that she ought never to have died. He said that it was merciless, and that he would kill the doctors—going on at a fearful rate—and then he would go back to the subject of this property. How long did that last, that condition of Dr. Warren? He was calmer after he had made the will. He was in a very bad condition, and, as near as I know, he was in a very wretched condition all of his days—the remainder of his life. He got so, I think, that he went out but little. You say that after the will had been drawn by the lawyer, whoever he was, Dr. Warren handed it to you to read? Please state as near as you can the language of the will which referred to the bequest to Mrs. Russell? I would not undertake to state the language, but my recollection is clear that it complied with the agreement that had been discussed. It complied with the agreement that Mrs. Russell should be given the property of her sister, with the exception of the $10,-000."

Daniel P. Bestor testifies:

"That he knew Dr. John A. Warren and Mrs. Martha B. Warren both very well; in fact, intimately. That he had known Mrs. Warren as far back as he

could recollect when he was a child, and had known Dr. Warren for about 25 years. That he had professionally represented Dr. Warren in only two matters prior to the death of his wife; one was advising him in regard to a claim he had against Francis Coxe and Atwood Violet of New Orleans, and the other was in reference to a loan to F. S. Parker and wife, and taking a mortgage on some property in Mobile which they owned to secure the loan. He does not recollect representing him in any other legal matters, except writing his will. He wrote Dr. Warren's last will and the codicil (which were probated); he also wrote a will for Dr. Warren in the latter part of December, 1899. That he had never written a will for him previous to that time. That his recollection of the provisions in the will that he wrote in 1899, so far as Mrs. Russell was concerned, is that he willed to her all property that he would leave, or that would turn out over $45,000 or $46,000."

Winston Jones, one of the appellees, testified:

"That on January 16, 1900, Dr. Warren requested him to come to see him and bring all of the papers of his and Mrs. Warren's, and he got me to have made out for him from his papers and Mrs. Warren's papers an inventory of all the property that he had and all the property that Mrs. Warren had. We discussed the items as we went along, and we made out a full inventory as Dr. Warren dictated and requested to be done. In the memoranda of his own individual matters he had this memoranda put in: 'Amount due me by M. B. Warren, being the amount I paid her for her loss in the Pettite matter.' He stated that this had always been the understanding between himself and Mrs. Warren: that if he outlived her that she was to pay him back this money. I have also heard Mrs. Warren and Dr. Warren discuss the matter between them, and it was so understood by and between them. The next item: 'Amount due me by Mrs. M. B. Warren, $2,000, being the amount which I gave her my check on Brown Bros. for.' He told me that she owed him this amount of money, $2,000, which he had given her a check for on Brown Bros. The value of Dr. Warren's estate at the time of his death, including Mrs. Warren's estate, was in the neighborhood of $50,000. Dr. Warren died March 24, 1901."

By request of appellant's counsel, this witness attached to his testimony the inventories to which he had referred, in which we find these amounts set down as belonging to the estate of Dr. Warren:

| | | |
|---|---:|---:|
| Cash with Winston Jones & Co. | $ 5,904 | 19 |
| Cash with Brown Bros. | 1,055 | 11 |
| Note of D. M. Russell. | 16,000 | 00 |
| Note of Parker and wife. | 8,000 | 00 |
| Interest on same. | 560 | 00 |
| Note of George Winston. | 6,000 | 00 |
| Amount due me by Mrs. M. B. Warren, being the amount I paid for her loss in the Pettite matter | 6,500 | 00 |
| Amount due me by Mrs. M. B. Warren, being amount for which I gave her my check on Brown Bros. | 2,000 | 00 |
| Total | $46,019 | 30 |

We also find set down, as having constituted the estate of Mrs. Martha B. Warren, items (which need not be specified) aggregating at par value $26,702.86, embracing shares of stock put down at $600 and one note at $300, which the witness Jones testifies were worthless. Exhibit D, attached to this testimony, presents a statement dated March 12, 1900, purporting to give the items of Dr. J. A. Warren's estate, aggregating at that time the sum of $39,760.03, embracing items of securities on the margin of which Dr. Warren has indorsed, "From M. B. W.," aggregating $13,077.18. The will of Dr. Warren that was pro-

bated was executed April 16, 1900. The eighth paragraph of this will was in words and figures as follows:

"At the time of my death if there should be anything left out of the money or property which I received under the will of my wife, after deducting $2,000 for which I gave her my check on Brown Brothers & Co., and the Pettite money or notes amounting to $6,500, and the notes and mortgage which I gave Mary B. Russell on the 25th of December, 1899, amounting to $6,500, and the F. S. Parker mortgage and notes for about $9,120.00; then I give and bequeath such amount so remaining and so derived from my wife's estate, to Mrs. Mary B. Russell, if she be living at the time of my death; but this legacy is based on the condition that my estate which I own at the time of my death shall be worth at least $46,000, and if it should be below said sum, then this legacy shall be void and of no effect; but if my estate shall be worth more than $46,000 at the time of my death, then so much of my estate as is above $46,000 shall go to Mrs. Mary B. Russell, the sister of my deceased wife; and this legacy is based on the further consideration that if Mrs. Russell should die before I do, then this special legacy shall be of no force and effect."

On February 26, 1901, J. A. Warren executed a codicil to this will, revoking and annulling the said eighth paragraph to said will, and devised his estate to others.

The will of Martha B. Warren, which was probated, bears date the 13th day of May, 1895. Besides special bequests and directions about administration, which need not be copied, it provides:

"And to my sister, Mrs. Mary Bliss Russell, of Coahoma County, Mississippi, I give and bequeath my diamond ring set in black enamel, and a topaz ring set around with pearls, a silver pepper box which came from our great-grand-parents; also the certificate of membership of our grandfather, William Leorrett, in the society of the Cincinnati, signed by General Washington and General Knox; and also the two china dishes coming from our grandmother. As my said sister has a handsome estate of her own, I make no further bequest to her than of these specific articles, just above enumerated. Third—The rest and residue of all my estate, real and personal, and in action, of which I may die seized and possessed or in any wise entitled to, I give, bequeath and devise unto my beloved husband, John A. Warren, to be absolutely his and in fee."

In reference to this will, the witness Harry Pillans testifies:

"I reside in Mobile, Ala., and am a lawyer; have been engaged in the practice some 33 years. I knew Mrs. Martha B. Warren and Dr. John A. Warren during their lifetime, not intimately, but very well indeed, Mrs. Warren being an intimate friend of some near friends of mine. I wrote a will for Mrs. Warren; the one that was probated, and a copy of which is shown me. I was one of the witnesses to that will; it was executed in my office. Mrs. Warren came into my office and said to me that she, having an estate of her own, wished to make a will, and wanted me to draw it; that Dr. Warren had a lawyer, but she preferred to have her own. She instructed me as to the disposition she desired should be made of her estate by the contemplated instrument, and left me to prepare it, which I did, I think, within the day of her call, or perhaps the next day, and notified her to come back to the office, and she did so. She then read and considered the will as drafted, said that it met with her instructions, and she then desired me to call witnesses in order that she might execute it at once. I called my partner, Mr. Hanaw, and he and I witnessed the will. I see there is a codicil to the will bearing the same date as the will. I do not recollect any particulars about this codicil being added, and could only draw the conclusion that this was an additional instruction given by her at the time she read over the will. I will add here that she asked me to retain the will in my safe until her death, in order that it might be preserved safely. I sealed it up in an envelope, which I indorsed, stating what was inside of it, and locked it up in a cash box in my safe,

where it remained until I learned of the death of Mrs. Warren, when I communicated, I think to Dr. Warren, who was ill at Mrs. Hodgson's, the fact that I had this will. I think she came alone on both occasions to my office. I am pretty well satisfied that Dr. Warren did not come with her."

Thus far we have proceeded on the assumption that such a contract as appellant avers and has sought to prove may be made and may be established by parol proof. The solicitor for the appellant contends with urgency and force that we are not concerned here with the question of the validity of limitations of a remainder over of real estate, where the first devisee takes the fee with power of disposition in fee, touching which, in Howard v. Carusi, 109 U. S. 725, 3 Sup. Ct. 575, 27 L. Ed. 1089, which was a case where real estate was sought to be reached, it was held that such limitation over would be void, as being inconsistent with the devise of the fee. That if the contract between Dr. and Mrs. Warren had been embodied as a limitation in the will of Mrs. Warren, and had related to real or personal estate in the state of Alabama, it would have been a good limitation under the statutes of that state (quoting sections 1046–1049 of the Code of Alabama of 1896), which sections have frequently been before the Supreme Court of Alabama, and have been construed in numerous cases (which he cites) and declared applicable to real and personal property. That the rule, therefore, announced in Howard v. Carusi, is abrogated by the Alabama statute, to the extent that the estate remaining unexpended at the death of the first taker passes by the will, although at common law the limitation would be void as derogating from the estate first given. But (he continues) the present case does not depend upon the validity or invalidity of limitations appearing in the face of the deed. Where such limitations have been held void as inconsistent with the estate, it has been done under rules of construction, and not because such limitations were illegal or contrary to public policy; that one may contract to leave the whole or any part of his own estate to a particular individual by will is too well settled by English and American authorities to be doubted. If there was a conflict in the authorities, it is settled in Alabama that such a contract can be made; and he cites Bishop's Heirs v. Bishop's Adm'r, 13 Ala. 475; Barrell v. Hanrick, 42 Ala. 60; Moore v. Campbell, 102 Ala. 445, 14 South. 780.

In the last of these cases, Moore v. Campbell, we find it stated that:

"The principle that a parol trust may be ingrafted upon a devise or bequest after probate of the will was declared in Bishop's Heirs v. Bishop's Adm'r, 13 Ala. 475, and followed in Barrell v. Hanrick, 42 Ala. 60. We are not aware that the question has arisen since in this state. The doctrine has found support in other states (citing cases). We do not feel at liberty to depart from the rule, inasmuch as the statute of wills was re-enacted in the same language after the rendition of these decisions, and it is not necessary to the decision in this case; but there are so many objections to its application to wills, we feel justified in pointing out some of them, that the legislative department may make statutory provision in the matter, if in its wisdom it sees proper to do so. We confine what we have to say to the statute of wills."

After a somewhat protracted and animated discussion of the subject, the opinion says further:

"But call it what you will, and argue as you may, a parol trust ingrafted upon a written bequest by parol testimony, by the decree of a court, after the-

death of the testator, is pro tanto the establishment of a parol will for the testator."

In Wall's Appeal, 111 Pa. on page 471, 5 Atl. 224, 56 Am. Rep. 288, in reference to a kindred though not identical case with the one before us, we find this language:

"Claims of this nature against dead men's estates, resting entirely in parol, based largely upon loose declarations, presented generally years after the services in question were rendered, and when the lips of the party principally interested are closed in death, require the closest and most careful scrutiny to prevent injustice being done. We cannot too often repeat the caution we have so frequently uttered on this subject, and we feel that the present occasion is one that demands both their repetition and their application."

In an earlier kindred case in the same court, Graham v. Graham's Executors, 34 Pa., we find on pages 480 and 481 this language used by Judge William Strong (afterward associate justice of the Supreme Court):

"The temptation to set up claims against decedents, particularly such decedents as have left no lineal heirs, is very great. It cannot be doubted that many such claims have been asserted which would never have been made known had it been possible for the decedent to meet his alleged creditor in a court of justice. Not unfrequently we witness a scramble for a dead man's effects, disreputable to those engaged in it, and shocking to the moral sense of the community. Such claims are always dangerous, and when they rest upon parol evidence they should be strictly scanned; especially where an attempt is made, under cover of a parol contract, to effect a distribution different from that which the law makes, or that which the decedent has directed by his will, should it meet no favor in a court of law. Even if such a contract may be enforced, it can only be when it is clearly proven by direct and positive testimony, and when its terms are definite and certain."

In O'Hara v. Dudley, 95 N. Y. 403, 47 Am. Rep. 53, where a trust was sought to be established by a letter of instructions from the testator to the legatee who drew the will, the judge, in delivering the opinion on the question we are now considering, referring to previous cases cited and discussed by him, said:

"All along the line of discussion it was steadily claimed that a plain and unambiguous devise in the will could not be modified or cut down by extrinsic matter lying in parol or unattested papers, and that the statute of frauds and that of wills excluded the evidence; and all along the line it was steadily answered that the devise was untouched, that it was not at all modified, that the property passed under it; but the law dealt with the holder for his fraud, and out of the facts raised a trust ex maleficio, instead of resting upon one as created by the testator."

Earlier in the opinion it was said:

"If, therefore, in her letter of instructions the testatrix had named some certain and definite beneficiary capable of taking the provision intended, the law would fasten upon the legatee a trust for such beneficiary, and enforce it, if needed, on the ground of fraud. Equity acts in such cases, not because of the trust declared by the testator, but because of the fraud of the legatee. For him not to carry out the promise by which alone he procured the devise and bequest is to perpetuate a fraud upon the devisor which equity will not endure."

In Moran v. Moran (Iowa) 73 N. W. 620, 39 L. R. A. 207, 65 Am. St. Rep. 443, it is said:

"That there are authorities to the effect that when a testator, because of the fraud of a devisee, is induced to make a devise on the representation by

the devisee that he will take the devise in trust for another who was the real object of his bounty, equity will enforce the trust, is not to be questioned (citing several cases). Numerous other cases could be cited, but it is not important to do so. In these cases—and if there are exceptions we have not noticed them—equity has interfered to enforce a trust on the ground of fraud, in the practice of which the devisee has by his acts or silence prevented the testator from, or led him to avoid, making provision in his will which he intended; and the cases cited were not for the construction of the wills, but to declare a trust on the fraudulent acts by which the making of the will was prevented. The cases do not attempt to change the wills or to construe them, but to fix obligations because of the acts of the devisee."

In a very learned note by the annotator to the report of the case of Gore v. Clarke (S. C.) 16 S. E. 614, 20 L. R. A. 465, it is stated:

"The general rule of law with regard to promises made to a testator is that, if one induces a testator not to insert a provision in his will in behalf or for the benefit of another, by promises or assurances that the promisor, whether he be the heir, personal representative, devisee, or residuary legatee will see to and carry out the testator's intention with regard to such party, it is fraud in such promisor, after the decease of such testator, to refuse to carry out the promise which imposed a legal duty upon him, that the courts of equity will compel him to fulfill and perform."

Counsel for the appellant thinks that it is idle to attempt to meet the current of the testimony for the complainant if the witnesses are to be credited, and that, to save Dr. Warren from a breach of contract, the court below was willing to presume that all of the witnesses for the complainant were guilty of perjury, and the complainant herself was asserting a baseless claim. It does not so appear to us. The complainant may honestly believe that she has a just claim against the estate of the appellees' testator, and the testimony she has offered may in some measure tend to show some kind of an understanding or agreement between Dr. Warren and his wife, resting in parol, while at the same time, to men accustomed to the administration of justice, and trained in the application of the rules by which right is sought in the courts, that testimony may appear wholly inadequate to establish the appellant's claim. The declarations of Mrs. Warren, except so far as they have been shown to have been clearly made known to Dr. Warren and assented to by him, are not competent evidence against the appellees. This record may not show, and it is only just to say that in our opinion it does not show, any ground for the slightest suspicion that any one of the witnesses who have testified in this case approach to or look toward the commission of perjury. But in the field of inquiry appropriate to the use of human testimony the area occupied by willful perjury, which is incapable of generating any belief, and which bounds this field on one side, is far removed from the opposite boundary, where are impartial witnesses, with natural faculties and training for the accurate perception of the truth and the accurate communication of it, whose testimony commands belief; and throughout the intermediate area there are elements of differing degrees of force which go to affect the weight of the testimony of witnesses whose character for truth and veracity is above suspicion. The nurse and the physician testified in reference to their understanding of what Dr. Warren had said on

the subject involved in this inquiry. Their testimony, so far as it tends to show any agreement between him and his wife, tends to show agreements differing substantially in their terms the one from the other. They differ also as to the time when the arrangement of which they speak had been made. The nurse says it was at the time they made their wills; the physician says that he understood from Dr. Warren that the conditions of the agreement between himself and his wife were all contained in their wills; that "the talk" had been long before the wills; that the wills were the outgrowth of the verbal agreement. It seems to us that this testimony, so far as it affects the appellant's case, is nugatory, and we are left with the testimony of D. M. Russell, and of his nephew, Percy Russell. We have inserted their testimony at great length, and it seems clear to us from D. M. Russell's testimony that he could not, in the condition in which he found Dr. Warren after the death of Mrs. Warren, have stated to him so clearly the declarations which Mrs. Warren had made to the witness and his wife that Dr. Warren could have understood it with sufficient distinctness to be charged with its admission by what he said or what he omitted to say. We should bear in mind that within a few hours after the death of Mrs. Warren, and within one hour after appellant had reached the place where her sister's body lay, there was developed between her and Dr. Warren a contention and an antagonism of thought which showed either that Mrs. Russell had not understood Mrs. Warren, or that she failed to convey distinctly to Dr. Warren's mind what Mrs. Warren had said; because it is clear from the testimony of Percy Russell that Dr. Warren then thought that the appellant was claiming that his wife had told her that the agreement between him and his wife was that the appellant should get all of the Bliss money immediately upon her sister's death, and that in the amount she was to get should be included the $10,-000 of Mrs. Warren's money which had been loaned at the instance of Dr. Warren, and for which he had stood security, and which, being lost, he had repaid to his wife during her lifetime. So strongly was this impression made upon the mind of Dr. Warren by his interviews with the appellant at Glen Springs, and during their journey from Glen Springs, that he insisted on talking about it continually to Percy Russell from the time they left Glen Springs until they parted at Salisbury, and almost the first words Dr. Warren said to D. M. Russell on their meeting at Mobile were: "Dave, Mary thinks that her sister left her property to her; that I was to hand it over to her. Well, now, I am going to have Martha's will brought here and read to you, so that you can see that she gave the property to me." When D. M. Russell told the doctor that Martha had said that when she got back to Mobile she would change her will and leave the note for $6,500, on her death, to her sister, Dr. Warren replied: "That is all right. She told me about it, and I am going to carry out Martha's wishes." And he sent at once for the note, indorsed it, and handed it to Mrs. Russell. The next day, or the day, after, he did have a will prepared, and the evidence shows that it provided that Mrs. Russell should take upon his death all of his estate that then exceeded $45,000 or $46,000. Three weeks after

that he caused to be prepared an inventory of his estate, embracing in it $8,500 due from Mrs. M. B. Warren, and showing a total of $46,019.30. On March 12th he took another account of stock, in which he includes in the list of his property assets received from M. B. Warren amounting to $13,077.18. One month later he made the will which was probated, and provided in it that at the time of his death, if there should be anything left out of the money or property which he had received under the will of his wife, after making deductions therefrom which he specified, so there should remain $46,000, then so much of his estate as exceeded that sum should go to the appellant, if she were then living. It is thus evident that, from the first hour his mind came to act on this subject after the death of his wife, his understanding was that he had an estate of $46,000, the corpus of which he was not required to invade as long as the bequest which he received from his wife was sufficient to meet his expenses. He expected his death to occur at any moment. He lived on, however, for more than a year, in great distress of body and depression of spirits, brooding over his poverty, and did not talk so much about anything except his poverty. Twenty-six days before his death did occur, he made the codicil revoking the eighth paragraph in his will, and devised his estate to others. He was not present when his wife had made her will five years before her death, and it is certain that he never saw that will until after her death. He and she had left Mobile and had arrived at Glen Springs in May, 1899. Leaving him at the sanitarium there, she went to Memphis, Tenn., to attend to some business for her husband and herself, with her brother-in-law, who owed Dr. Warren over $16,000, and owed her $6,500, both on note and mortgage. In the settlement which she then made she received from her brother-in-law, for Dr. Warren, a cash payment which reduced the amount of that debt to $16,000. It had been bearing 8 per cent. interest, but she reduced the rate of interest to 6 per cent., and extended the loan, taking a new note, dated November 14, 1899, due six years after date, with interest payable annually. It was in connection with this settlement that Mrs. Warren explained to her brother-in-law and to the appellant that Dr. Warren had by a prior will left all of his property to his wife, charging it with an annuity in favor of his sister. Mrs. Moore, and that that had been changed and, instead of leaving an annuity to Mrs. Moore, he had now left her the $16,000 note. After making these statements about the change that had been made by Dr. Warren in his will, Mrs. Warren said to the witness and his wife: "I think that as he has made this bequest that I ought to leave Mary a direct bequest, and when I get back to Mobile I am going to leave her your note for $6,500 on my death." This indicates beyond question that the change to which it refers had been made after they left Mobile in May, and we learn from the testimony of Percy Russell that the change in Dr. Warren's purpose was made to meet the wishes of his wife. This witness says that he (Dr. Warren) "went on furthermore to tell me all"—how it was that the $6,500 should be given to Mary at once, because from some objection of Mrs. Warren to handling his estate in the event of his death, they had agreed that the

note for $16,000 held by them against Mr. D. M. Russell should be given to Dr. Warren's sister, and that Mrs. Warren had thereupon said she was going to give to Mrs. Russell the $6,500. Much stress is laid upon the fact that, immediately upon the death of Mrs. Warren, Dr. Warren was urgent to hasten home that he might make his will. If he had a written will in existence at the time of his wife's death, or at any time previous to that, no one who ever saw it has so testified in this case. He was childless; his domicile was in the state of Alabama; his estate consisted wholly of personal property in Alabama and Mississippi. It was not necessary during the lifetime of Mrs. Warren for Dr. Warren to have a written will in order to secure the purpose which the proof most strongly shows that these devoted spouses had—that the survivor should enjoy in fee simple both estates, and would make proper provision, testamentary or otherwise, for the rightful disposition of what remained at his or her death. Section 1462, Code Ala. 1896; section 1545, Ann. Rev. Code Miss. 1892. Assuming that their minds were in accord on this subject, we can almost feel the touch of the resentment in the tone of her reply when her brother-in-law asked her if it would not be best to provide for that agreement in her will. We can understand, also, why it was that he kept the assets of his own estate, as far as he is shown to have done so, separated from that which he had received by the bequest of his wife; and it is not difficult to understand how, when from causes of shrinkage not shown his whole estate had settled to a level not much above $46,000, he felt that the $6,500 which he had handed to the appellant while his wife's body was yet unburied was full satisfaction of the pious duty which his knowledge of his wife's wishes imposed upon him. He is shown to have been an honorable man, and one who would do what he had agreed to do.

We make one more quotation from the note in Gore v. Clarke, supra:

"There must, however, in every case be a promise proven to the satisfaction of the court, which the court will enforce against the testator's estate in the hands of the promisor, of which the latter is enjoying the benefit. There may be suspicions of the deceased's intentions to provide by will, and such suspicions may operate upon the minds of those taking to induce them to consider themselves bound in honor and conscience to perform those intentions, but neither at law nor in equity can such a promise be fulfilled or enforced without some proof of it."

Whatever may have been "the talk" of Dr. Warren and his wife, the evidence in this case is not sufficient to show such a verbal contract between them, or to show any such fraud on his part, either willful and actual, or constructive, as to require or permit a court of equity or of law to enforce the appellant's claim against Dr. Warren's estate in the hands of the appellees.

The decree of the Circuit Court is affirmed.